[No. S174633. Aug. 19, 2010.]

ARDELL MOORE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

804

## COUNSEL

Michael P. Judge, Public Defender, Albert J. Menaster, Karen King and Jack T. Weedin, Deputy Public Defenders, for Petitioner.

Alan A. Abrams and Maheen Patel for American College of Forensic Psychiatry as Amicus Curiae on behalf of Petitioner.

Michael J. Aye as Amicus Curiae on behalf of Petitioner.

Norton & Melnik and Todd L. Melnik as Amici Curiae on behalf of Petitioner

No appearance for Respondent.

Steve Cooley, District Attorney, Irene Wakabayashi, Head Deputy District Attorney, Phyllis Asayama and Roberta T. Schwartz, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**BAXTER, J.**—Defendant Ardell Moore was convicted of forcible oral copulation against a teenage girl he abducted in 1978. He was imprisoned and then paroled in 1981. In 1984, he kidnapped and sexually assaulted another female victim he did not know, and served a lengthy prison term following his conviction for those crimes. Upon his release from prison in 2000, defendant was tried and committed as a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA or Act) (Welf. & Inst. Code, § 6600 et seq.).[1] Such commitment involved confinement and treatment in a secure hospital setting.

This case arises from a proceeding to extend defendant's commitment as an SVP. Between the time the trial court found probable cause that he would likely reoffend if released and the time the recommitment petition was set to be tried, defendant moved to stay the proceedings and to determine his mental competence to stand trial. The court denied the motion on the ground such procedure was not statutorily authorized or constitutionally compelled under the SVPA. Defendant sought mandate in the Court of Appeal. He claimed due process prevented him from being tried as an SVP if he could not understand the proceedings or cooperate with counsel. The Court of Appeal agreed. It relied heavily on *People v. Allen* (2008) 44 Cal.4th 843 [80 Cal.Rptr.3d 183, 187 P.3d 1018] (*Allen*), which recognized the due process right of an alleged SVP to testify over counsel's objection at his commitment trial.

We granted the People's petition for review to decide whether the defendant in an SVP proceeding has a due process right not to be tried or civilly committed while mentally incompetent. Consistent with the conclusion reached by every out-of-state decision to consider the issue, the answer is "no." *Allen* focused on the extent to which the defendant, as to whom no competence issue was raised, could testify at his trial to explain his own conduct and dispute the foundation of expert opinion about his mental disorders and dangerousness. There, to the extent such testimony was even relevant, it arguably enhanced the reliability of the SVP determination, allowed commitment under the Act, and imposed no significant impediment to enforcement of the SVPA's legitimate goals in an appropriate case.

---

[1] All further statutory references are to the Welfare and Institutions Code except as otherwise stated.

Here, however, we confront a wholly different situation, which is likely to arise in countless other cases. Defendant insists that the diagnosed mental disorders that allegedly make him a sexually dangerous predator also impair his mental competence to stand trial, and that the state therefore cannot try or commit him as an SVP unless or until his competence is restored. Thus, unlike in *Allen*, recognition of the due process right claimed here could prevent an SVP determination from being made *at all*. Such a scenario, which could often recur, would undermine the purpose and operation of the Act. The state could not confine and treat some of its most dangerous sex offenders under conditions targeting their disorders, and public safety could suffer as a result. For these reasons, courts in other states with similar statutes have uniformly held that due process does not prevent the trial and commitment of SVP's while mentally incompetent. The same approach is followed under at least one other civil commitment scheme in this state. We therefore reverse the Court of Appeal.

## I. CASE HISTORY

On February 11, 2005, the State Department of Mental Health (DMH), in a letter signed by the acting medical director at Atascadero State Hospital (Atascadero), asked the Los Angeles County District Attorney to seek an extension of defendant's commitment as an SVP. The letter said that he continued to meet the criteria for commitment, and that his term would expire soon.

Attached to the DMH letter were "Recommitment Evaluations" prepared in January 2005 by Shoba Sreenivasan, Ph.D., and Elaine Finnberg, Ph.D. Both evaluators were licensed psychologists, apparently retained by the DMH. They began their reports by describing defendant's two criminal cases, as follows.[2]

First, a jury convicted defendant of forcible oral copulation against Maria M. in 1978, when she was 16 years old. (See Pen. Code, § 288a, subd. (c)(2).) Defendant (who was then age 21) forced the victim, a stranger, from a public bus into a residence. He grabbed her by the neck, told her to suck his penis, and made her strip from the waist down in order to rape her.

---

[2] The experts stated in their reports that they met briefly with defendant, who was then 47 years old. Each time, after being told of the nature and purpose of the interview, he declined to participate. Dr. Sreenivasan noted that defendant would not sign a form she gave him, and generally seemed alert and oriented. Dr. Finnberg commented on defendant's polite manner. He read the form she gave him, refused to sign it, and asked her to contact his attorney. Both evaluations made clear that they were based on court documents, police and probation reports, prison and hospital records, and medical and psychological evaluations.

The victim screamed and managed to flee when someone interrupted the attack. Defendant served a three-year prison term and was paroled in 1981.[3]

Second, a jury convicted defendant of kidnapping (see Pen. Code, § 207, subd. (a)), forcible rape (*id.*, § 261, subd. (a)(2)), and forcible rape in concert (*id.*, § 264.1) against Genetta S. in 1984. Defendant offered a car ride to the 26-year-old victim, a stranger he met late one night. He forced her to enter an abandoned building in which other men were lurking. Defendant beat and bound the victim, after ordering her to undress. He then orally copulated, raped, and sodomized her. At least one other man sexually assaulted her too. She later escaped. Defendant was sentenced to 25 years in prison.[4]

The recommitment evaluations described defendant's behavior while imprisoned for the Genetta S. crimes, as follows: He often broke prison rules by exposing his penis and masturbating in the presence of female staff. Such sexual misconduct occurred in addition to numerous other rule violations, including possessing makeshift weapons, destroying state property, assaulting an inmate, resisting staff, and refusing to provide required DNA samples.

The reports by Drs. Sreenivasan and Finnberg noted that defendant's misdeeds continued after he first entered Atascadero as an SVP in April 2000, upon his release from prison. In October 2001, his parole was revoked and he was returned to prison for indecent exposure in Atascadero. He was recommitted as an SVP and readmitted to the hospital in April 2003. Throughout his time in Atascadero, both before and after the parole revocation, defendant frequently committed rule violations—sometimes more than once a day. He verbally abused and threatened male and female staff, sexually propositioned other patients, and subjected female staff to a wide range of sexually inappropriate and hostile acts (e.g., staring at them, soliciting and discussing sex, walking around nude, and masturbating).

---

[3] Both reports noted that in 1978, when he attacked Maria M., defendant was on probation for another sex crime committed in 1977, when he was 20 years old. There, defendant orally copulated a boy in a public restroom while working as a custodian at an elementary school. He pled guilty to trespass. (See Pen. Code, § 602.) His sentence included county jail time, community service, and probation.

[4] The evaluators mentioned civil commitment efforts that may have occurred while defendant was being prosecuted or punished for his sex crimes. Dr. Sreenivasan reported that, after his conviction in the Maria M. case, defendant was diagnosed as a mentally disordered sex offender, admitted to the state hospital system, found unamenable to treatment, and returned to prison to serve his sentence. The same report further asserts, without explanation, that defendant was found incompetent while standing trial for the Genetta S. crimes at some point between 1984 and 1987, and that he entered Atascadero as a mentally disordered prisoner between 1990 and 1994. Dr. Finnberg reported that between 1978 and 1980, during the Maria M. case, defendant was hospitalized because he was found to be both mentally incompetent and a mentally disordered sex offender.

Both experts diagnosed defendant with a multidimensional mental disorder under the "DSM-IV-TR."[5] First, he suffers from paraphilia, involving intense and recurrent sexual fantasies, urges, or acts against nonconsenting persons. Dr. Sreenivasan explained that the condition has spanned defendant's adulthood and has involved sadistic tendencies. Dr. Finnberg concurred, and found evidence of exhibitionism due to defendant's indecent exposure and masturbation in custody. Second, the experts tendered a diagnosis of schizoaffective disorder with bipolar and psychotic components. Symptoms included paranoid and persecutory thoughts (e.g., people wanting to hurt or annoy him), delusions (e.g., his victims sexually tempting him), hypomania (e.g., pressurized and rambling speech, and tangential thought processes), and florid psychosis (e.g., auditory hallucinations). Third, both evaluators diagnosed defendant with antisocial personality disorder, manifested by his persistent disregard of societal norms and the rights of others. Dr. Finnberg noted that defendant has shown no remorse or empathy, and has denied committing any crimes or sexual misdeeds.[6]

Regarding treatment for these conditions, both evaluators described the "Sex Offender Commitment Program" made available to SVP's at Atascadero. It involves five intensive phases of specialized education and behavior training, and includes ancillary therapies for anger management and substance abuse. Dr. Sreenivasan noted that defendant had declined to participate in any phase of the program and had resisted taking medications that would reduce his sexual impulses. Dr. Finnberg opined that defendant's mental disorders made him both unwilling and unable to accept structured treatment, and that he refused to do anything that would reduce sexual arousal. Sometimes, however, he participated in group recreational activities, and met on an individual basis with a staff psychologist.

Finally, the experts agreed that defendant was likely to engage in sexually violent predatory criminal acts in the future without appropriate treatment and custody. They reviewed risk factors under the "Static-99" scale, and gave defendant a score of either nine (Dr. Sreenivasan) or 10 (Dr. Finnberg), placing him in the "high risk" range covering anyone who scores six or

---

[5] This abbreviation refers to the current version, or "Text Revision," of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association (4th ed. 2000).

[6] Drs. Sreenivasan and Finnberg also found evidence of polysubstance abuse (i.e., alcohol and illegal drugs). This maladaptive behavior began in defendant's teenage years, triggered withdrawal symptoms in 1985 after his arrest for the Genetta S. crimes, and continued at least through 1994, when he was suspected of drug trafficking in Atascadero. Dr. Finnberg predicted the problem would resurface if defendant were released.

higher. Many factors contributed to his risk of reoffense (e.g., nature and severity of psychiatric disorders, nonparticipation in treatment, willingness to blame his victims, refusal to show remorse or admit wrongdoing, and continued sexual misconduct in a structured setting). No mitigating factors were found. Dr. Sreenivasan observed that defendant indulges his sexual urges "when he wants and how he wants," and remains "undeterred" by any criminal or civil sanction.

On March 8, 2005, the People petitioned to extend defendant's commitment under the SVPA.[7] The petition alleged that defendant had been convicted of three sexually violent offenses in two different cases (forcible oral copulation, rape, and rape in concert), that he suffers from a diagnosed mental disorder, and that he is dangerous and likely to reoffend without proper treatment and custody. The DMH evaluations supporting these allegations were cited in the petition and apparently attached thereto. Other supporting documents sought an arraignment and probable cause hearing, and asked that defendant, whose commitment expired on May 7, 2005, be held in a secure facility until the petition was resolved.

On April 12, 2005, counsel was appointed for defendant, and he was arraigned. The defense denied the allegations of the petition. After reviewing the petition and attached mental evaluations, the trial court found sufficient facts which, if true, would constitute probable cause to believe that defendant was likely to commit sexually violent predatory criminal acts if released. Defendant, who apparently was housed at Atascadero at the time, was ordered to remain in custody pending the probable cause hearing.

Before such hearing, and for reasons not clear from the record, defendant moved for new counsel under *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]. According to a minute order issued on June 23, 2005, defendant appeared in court, and the *Marsden* motion was argued and denied.

---

[7] At the time the petition was filed, the statutory scheme authorized a two-year period of confinement and treatment for persons adjudicated as SVP's. (See former § 6604, as amended by Stats. 2000, ch. 420, § 3, p. 3139.) Subsequent commitments extending the term for two years could be obtained under procedures similar to those regulating initial commitments. (See former § 6604.1, subds. (a) & (b), as amended by Stats. 2000, ch. 420, § 4, p. 3140.) On November 7, 2006, California voters passed Proposition 83, The Sexual Predator Punishment and Control Act: Jessica's Law (Proposition 83), which, among other things, amended the SVPA in certain respects, effective November 8, 2006. One such change provided for an indeterminate commitment term subject to certain conditions not relevant here. (See §§ 6604, 6604.1, 6605; see also *People v. McKee* (2010) 47 Cal.4th 1172, 1186–1187 [104 Cal.Rptr.3d 427, 223 P.3d 566]; *Allen, supra,* 44 Cal.4th 843, 849, fn. 4, 858–859 & fns. 10–13.)

On August 18, 2005, the trial court held a hearing to determine whether there was probable cause to believe that defendant was likely to engage in sexually violent predatory criminal acts if released. The People called Drs. Sreenivasan and Finnberg to testify in this regard. Consistent with their written evaluations, which were admitted into evidence, both witnesses described defendant's sexually violent offenses, his diagnosed mental disorders, and his high risk of reoffense. The trial court found probable cause to hold defendant to answer on the allegations of the petition, and ordered him confined at Atascadero until trial was complete. A pretrial hearing was set for November 16, 2005. However, for reasons that are not clear from the record, the matter was continued to long after that date.

On or about February 5, 2007, defendant, acting through counsel, filed the motion at issue here. He asked the trial court to order a mental competence hearing and to stay recommitment proceedings until his competence to stand trial under the SVPA was determined. In his motion, defendant acknowledged that there was no statutory basis for his request either under the SVPA (which does not mention mental competence to stand trial), or under Penal Code section 1367 et seq. (which regulate the mental competence of criminal defendants in pending prosecutions). Nevertheless, defendant insisted that the fundamental liberty interests at stake in involuntary civil commitment proceedings weighed in favor of recognizing a due process right to mental competence under the SVPA analogous to the one criminal defendants possess. (See *Medina v. California* (1992) 505 U.S. 437, 439 [120 L.Ed.2d 353, 112 S.Ct. 2572] (*Medina*) [U.S. Const. prohibits criminal prosecution of person who is incompetent to stand trial].) He urged the court to "improvise" and create appropriate competence procedures for alleged SVP's.

Attached to the motion was a letter from a psychologist, Vianne Castellano, Ph.D., to defense counsel, dated January 12, 2007.[8] Based on interviews held shortly before that date, Dr. Castellano found that defendant was not competent to participate in the "upcoming hearing." She opined that he could not understand the nature and purpose of the proceedings, or cooperate in a rational manner with counsel or mental health experts. A "possible diagnosis" was bipolar disorder with depressive and hypomanic episodes (recurrent and severe), and with psychotic features. Dr. Castellano emphasized defendant's "fixed and pervasive delusional system." Symptoms included mood swings accompanied by paranoid and persecutory thoughts, auditory hallucinations,

---

[8] The circumstances under which Dr. Castellano became involved in this case are not clear from the record. In her letter to counsel, she simply states that she was appointed by the court on October 24, 2006. Minute orders corresponding to the same date do not refer to Castellano or to any mental competence concerns.

tangential thought processes, and pressurized and confused speech. In Dr. Castellano's view, defendant seemed anxious, and possessed a superficial awareness of events.

The People opposed defendant's effort to stay or halt proceedings to recommit him as an SVP. On March 21, 2007, the trial court heard and submitted the matter. Defendant's motion was denied on April 9.

In its ruling, the trial court noted that the SVPA covers sexually violent offenders who suffer from mental disorders that can affect their competence to stand trial. According to the court, allowing defendants to avoid an SVP trial while incompetent would substantially interfere with the purpose of the Act to protect public safety by confining and treating such persons for their mentally disordered sexual dangerousness. Thus, in declining to recognize such a due process right, the court concluded that the interests of the defendant—who receives many procedural rights under the SVPA, including the right to counsel—were outweighed by the interests of the public. No basis was found for defendant's assertion that "competency training" (which he never described), should prevail over treatment under the SVPA, or that a mentally incompetent SVP cannot benefit from treatment to control his sexual dangerousness. In reaching its conclusion, the trial court followed certain out-of-state cases that had reached the same result under analogous circumstances, including *Commonwealth v. Nieves* (2006) 446 Mass. 583 [846 N.E.2d 379, 385–386] (*Nieves*).[9]

On April 30, 2007, defendant petitioned the Court of Appeal for a writ of mandamus and/or prohibition to vacate the trial court's order denying a hearing on his mental competence to be tried as an SVP, and to stay recommitment proceedings until the issue was resolved. On May 9, 2007, the Court of Appeal, Second Appellate District, Division Three, stayed all such proceedings in the present case pending further order of that court. The appellate court also directed the People, represented by the District Attorney of Los Angeles County, to file a response to the petition. On July 3, 2007, the Court of Appeal issued an order to show cause why the requested relief should or should not be granted.

The Court of Appeal heard oral argument on September 17, 2007. Subsequently, on July 9, 2008, the Court of Appeal vacated submission to await a

---

[9] At the time, defendant was housed in Coalinga State Hospital. He had been transferred there from Atascadero between November 2005 and April 2006. According to the DMH Web site, Coalinga was built in 2005, and is the state's newest secure mental treatment facility. Its patient population consists of "forensically committed individuals—mostly sexually violent predators who were transferred from Atascadero State Hospital—in early September 2005." (DMH, Coalinga State Hospital <http://www.dmh.ca.gov/Services_and_Programs/State_Hospitals/Coalinga/default.asp> [as of Aug. 19, 2010].)

decision in *Allen, supra,* 44 Cal.4th 843, which was then pending before this court. *Allen* was decided on July 28, 2008. On June 4, 2009, after vacating submission two more times, the Court of Appeal filed its decision granting writ relief.

The Court of Appeal accepted defendant's claim that an SVP has a constitutional right not to be tried while mentally incompetent. The Court of Appeal observed that *Allen, supra,* 44 Cal.4th 843, after balancing the interests at stake in that case, held that an SVP defendant has a federal and state due process right to testify and to present his story at trial, even where counsel objects. Concerned that a mentally incompetent SVP cannot participate meaningfully in his own defense, the Court of Appeal concluded that the constitutional balance favored defendant in this case, as follows: "(1) the liberty interest at stake in an SVPA proceeding is significant; (2) proceeding with an SVPA trial against an incompetent defendant poses an unacceptable risk of an erroneous deprivation of liberty; (3) the governmental interest in protecting its citizens and treating [SVP's] is not significantly burdened by providing for a competency determination in the SVPA context; and (4) the defendant's dignitary interest in presenting his side of the story is protected by ensuring the defendant is competent to stand trial."

The Court of Appeal acknowledged that several decisions from other states had "all" held that a mentally incompetent person can be tried under schemes similar to the SVPA. However, the court found those cases to be unpersuasive, saying they had focused too narrowly on "the nominally civil nature" of commitment as an SVP.

Exercising its inherent power, and alluding to the mental competence scheme applicable in criminal prosecutions (see Pen. Code, § 1367 et seq.), the Court of Appeal issued this order: "[O]n remand the trial court is directed to conduct a hearing into [defendant's] competence to stand trial as an [SVP]. In the event the trial court determines [defendant] is not presently competent to stand trial, the court shall order [him] held in a state hospital for the care and treatment of the mentally disordered until such time as he is restored to competence."

The People petitioned for review to address the constitutional issue decided by the Court of Appeal. On September 17, 2009, we granted the petition.

## II. SVPA PROCEDURES

The SVPA targets a select group of convicted sex offenders whose mental disorders predispose them to commit sexually violent acts if released following punishment for their crimes. (*Hubbart v. Superior Court* (1999) 19

Cal.4th 1138, 1143–1144 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*).) The Act confines and treats such persons until their dangerous disorders recede and they no longer pose a societal threat. SVP trials are " 'special proceedings of a civil nature,' " wholly unrelated to any criminal case. (*People v. Yartz* (2005) 37 Cal.4th 529, 535 [36 Cal.Rptr.3d 328, 123 P.3d 604].) They are not punitive in purpose or effect. (*Hubbart, supra,* at pp. 1144 & fn. 5, 1170–1179.)

■ Commitment depends upon whether the person is found to be an SVP—a finding that ensures the Act applies to only "the most dangerous offenders." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1187 [124 Cal.Rptr.2d 186, 52 P.3d 116] (*Hurtado*).) When defendant's recommitment proceeding began in the trial court, an SVP was defined as someone who "has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Former § 6600, subd. (a)(1), as amended by Stats. 2000, ch. 643, § 1, p. 4192.)[10] ■ A " '[s]exually violent offense' " consists of certain enumerated crimes committed by "force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person . . . ." (§ 6600, subd. (b).)

■ In addition, a " '[d]iagnosed mental disorder' " refers to "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c); see *People v. Williams* (2003) 31 Cal.4th 757, 774 [3 Cal.Rptr.3d 684, 74 P.3d 779] [such disorder requires "serious difficulty" controlling behavior].) We have made clear that a person is predisposed and likely to reoffend as an SVP if, because of a current mental disorder making it difficult to restrain sexually violent behavior, he presents "a substantial danger, that is, a serious and well-founded risk" that he will commit such crimes if released. (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 922 [119 Cal.Rptr.2d 1, 44 P.3d 949], italics omitted.) This sexually violent criminal behavior must be "predatory" (*Hurtado, supra,* 28 Cal.4th 1179, 1186), which includes acts targeting strangers (§ 6600, subd. (e)).

■ The process for determining whether a convicted sex offender meets these standards occurs in several stages, and ensures a seamless transition from prison to a secure treatment facility if commitment occurs. First, the

---

[10] Proposition 83 amended the definition of an SVP to include persons who have been convicted of a "sexually violent offense against *one* or more victims." (§ 6600, subd. (a)(1), italics added.)

Department of Corrections and Rehabilitation screens inmates at least six months before their scheduled release from prison, and refers those likely to be SVP's to the DMH for full mental evaluations. (§ 6601, subds. (a)(1) & (b).) Where two evaluators agree that the inmate is an SVP, the Director of Mental Health transmits a request for a petition for commitment to the county in which the inmate was convicted of the offense for which he is imprisoned. (§ 6601, subds. (d), (h) & (i).) If the county's SVP counsel (either the district attorney or county counsel, as designated by the county board of supervisors) concurs with the recommendation, a petition for commitment is filed in the trial court. (*Id.*, subd. (i).)

The trial court then determines whether there is "probable cause" to believe that the defendant "is likely to engage in sexually violent predatory criminal behavior" upon release. (§ 6602, subd. (a); see § 6601.5.) While such hearing is underway, the defendant must "remain in custody." (§ 6602, subd. (a).) If probable cause is found, "the judge shall order that the person remain in custody in a secure facility until a trial is completed and shall order that a trial be conducted . . ." to determine whether he meets the statutory definition of an SVP. (*Ibid.*) The term "secure facility," as used in the probable cause statute and elsewhere in the Act, has a particularized meaning. (*Hubbart, supra*, 19 Cal.4th 1138, 1147, fn. 11.) The definition excludes most state hospitals by name or description, and refers to a facility dedicated to the housing and treatment of SVP's. (§ 6600.05.)[11]

At trial, the following statutory protections apply: "[The defendant] shall be entitled to a trial by jury, to the assistance of counsel, to the right to retain experts or professional persons to perform an examination on his or her behalf, and to have access to all relevant medical and psychological records and reports. In the case of a person who is indigent, the court shall appoint

---

[11] Section 6600.05 states: "(a) Until a permanent housing and treatment facility is available, Atascadero State Hospital shall be used whenever a person is committed to a secure facility for mental health treatment pursuant to this article and is placed in a state hospital under the direction of the State Department of Mental Health unless there are unique circumstances that would preclude the placement of a person at that facility. If a state hospital is not used, the facility to be used shall be located on a site or sites determined by the Director of Corrections and the Director of Mental Health. In no case shall a person committed to a secure facility for mental health treatment pursuant to this article be placed at Metropolitan State Hospital or Napa State Hospital. [¶] (b) A permanent facility for the housing and treatment of persons committed pursuant to this article shall be located on a site or sites determined by the Director of Corrections and the Director of Mental Health, with approval by the Legislature through a trailer bill or other legislation. The State Department of Mental Health shall be responsible for operation of the facility, including the provision of treatment." It appears from the record regarding defendant's placement in this case, and from counsel's statements at oral argument in this court, that Coalinga State Hospital offers "permanent housing and treatment" for persons committed as SVP's, and serves as a "secure facility" under section 6600.05. (See, *ante*, fn. 9.)

counsel to assist him or her, and, upon the person's request, assist the person in obtaining an expert or professional person to perform an examination or participate in the trial on the person's behalf." (§ 6603, subd. (a).) In addition, the trier of fact is required to determine whether the defendant is an SVP "beyond a reasonable doubt." (§ 6604.) Any jury verdict on the issue must be "unanimous." (§ 6603, subd. (f).)

Regarding evidence admitted at trial, prior crimes play a limited role in the SVP determination. (*Hubbart, supra,* 19 Cal.4th 1138, 1145.) "Conviction of one or more [sexually violent offenses] shall constitute evidence that may support a court or jury determination that a person is a sexually violent predator, but shall not be the sole basis for the determination." (§ 6600, subd. (a)(3).) Within certain limits, documentary evidence may be used to prove relevant circumstances surrounding such an offense. (*Ibid.*; see *People v. Otto* (2001) 26 Cal.4th 200, 210–211 [109 Cal.Rptr.2d 327, 26 P.3d 1061] (*Otto*) [requiring victim hearsay statements to contain special indicia of reliability where used to establish predicate offenses or support expert opinion].) To ensure commitment under proper standards, "[j]urors shall be admonished that they may not find a person a sexually violent predator based on prior offenses absent relevant evidence of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(3).)

Adjudication as an SVP entails confinement and appropriate treatment "in a secure facility" (§ 6604) within the meaning of section 6600.05. When the present proceeding began in the trial court, such persons were committed "for two years." (Former § 6604, as amended by Stats. 2000, ch. 420, § 3, p. 3139.) Under the same version of the law, any subsequent extended commitment was also for two years. (Former § 6604.1, subd. (a), as amended by Stats. 2000, ch. 420, § 4, p. 3140.) As noted, statutory changes affecting the length of the term have since occurred. (See, *ante,* fn. 7.) Various posttrial provisions, which we discuss further below, require ongoing evaluation of the SVP in custody, and ensure that involuntary commitment does not continue if his mental condition materially improves. (See §§ 6605, 6608.)

Finally, the secure nature of confinement under the SVPA does not negate its therapeutic features. The DMH "shall afford the person with treatment for his or her diagnosed mental disorder." (§ 6606, subd. (a).) This treatment obligation exists even where the person resists (*id.,* subds. (a) & (e)),[12] and where treatment has only a low chance of success in the particular

---

[12] Section 6606, subdivision (a) states: "A person who is committed under this article shall be provided with programming by the State Department of Mental Health which shall afford the person with treatment for his or her diagnosed mental disorder. Persons who decline

case (§ 6606, subd. (b)).[13] The program must meet "current institutional standards for the treatment of sex offenders," and must follow "a structured treatment protocol" developed by the DMH. (§ 6606, subd. (c).) The outline of the protocol appears in the Act.[14]

## III. DISCUSSION

■ Criminal defendants have a constitutional right not to be tried while mentally incompetent. (*Medina, supra*, 505 U.S. 437, 439; accord, *Drope v. Missouri* (1975) 420 U.S. 162, 181 [43 L.Ed.2d 103, 95 S.Ct. 896]; *Pate v. Robinson* (1966) 383 U.S. 375, 384–386 [15 L.Ed.2d 815, 86 S.Ct. 836]; *People v. Rogers* (2006) 39 Cal.4th 826, 846 [48 Cal.Rptr.3d 1, 141 P.3d 135].) However, SVP proceedings are civil, not criminal, in nature. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 361–369 [138 L.Ed.2d 501, 117 S.Ct. 2072]; *Hubbart, supra*, 19 Cal.4th 1138, 1170–1179.) It is well settled that rights available in criminal trials do not necessarily apply in civil commitment proceedings. (*Allen, supra*, 44 Cal.4th at p. 860; see *Allen v. Illinois* (1986) 478 U.S. 364, 375 [92 L.Ed.2d 296, 106 S.Ct. 2988] [5th Amend. privilege against compulsory self-incrimination does not apply in SVP proceeding]; *Otto, supra*, 26 Cal.4th 200, 214 [same, as to 6th Amend. right to confront and cross-examine witnesses].) But because civil commitment involves a significant restraint on liberty, the defendant in an SVP proceeding is entitled to certain due process protections. (*Allen, supra*, 44 Cal.4th 843, 862, citing *Foucha v. Louisiana* (1992) 504 U.S. 71, 80 [118 L.Ed.2d 437, 112 S.Ct. 1780].)

---

treatment shall be offered the opportunity to participate in treatment on at least a monthly basis." Subdivision (e) of the same section states: "The department shall meet with each patient who has chosen not to participate in a specific course of offender treatment during monthly treatment planning conferences. At these conferences the department shall explain treatment options available to the patient, offer and re-offer treatment to the patient, seek to obtain the patient's cooperation in the recommended treatment options, and document these steps in the patient's health record. The fact that a patient has chosen not to participate in treatment in the past shall not establish that the patient continues to choose not to participate."

[13] Section 6606, subdivision (b) states, "Amenability to treatment is not required for a finding that any person is a person described in Section 6600, nor is it required for treatment of that person. Treatment does not mean that the treatment be successful or potentially successful, nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program."

[14] Section 6606, subdivision (c) states: "The programming provided by the State Department of Mental Health in facilities shall be consistent with current institutional standards for the treatment of sex offenders, and shall be based on a structured treatment protocol developed by the State Department of Mental Health. The protocol shall describe the number and types of treatment components that are provided in the program, and shall specify how assessment data will be used to determine the course of treatment for each individual offender. The protocol shall also specify measures that will be used to assess treatment progress and changes with respect to the individual's risk of reoffense."

In determining "what process is due" a potential civil committee (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 92 S.Ct. 2593]), we employ a balancing test. There are four factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official. (*Allen, supra,* 44 Cal.4th 843, 862–863; see *Otto, supra,* 26 Cal.4th 200, 210.)

In *Allen, supra,* 44 Cal.4th 843, we held that the defendant in an SVP recommitment proceeding has the right to testify in his own behalf, even over his counsel's objection. Under the particular circumstances there presented, we concluded that the private interests advanced by affording such a right outweighed the minimal fiscal and administrative burden it would impose upon the state.

Here, as below, the parties debate the significance of *Allen* with respect to the due process implications of being tried as a mentally incompetent SVP. Defendant insists that, after weighing the relevant factors, *Allen* recognized the constitutional right of an SVP to "meaningfully participate" at trial, i.e., to tell his version of events on the witness stand against counsel's advice. According to defendant, an alleged SVP whose incompetence prevents him from understanding the proceedings or rationally assisting counsel cannot meaningfully participate in his defense under *Allen.* Defendant thus reasons he has a constitutional right, analogous to the one afforded to the testifying defendant in *Allen,* to participate in the proceedings only when mentally competent to do so.

The People, the petitioners here, urge a more restrained reading of *Allen,* which they insist has nothing to do with mental competence under the SVPA. In the People's view, both defendant and the Court of Appeal have failed to appreciate that the interests weighed for due process purposes are significantly different where the claimed constitutional right concerns mental competence of an alleged SVP to be tried and committed *altogether,* as opposed to the right of a presumably competent defendant to testify on discrete factual issues under the Act.

Following our own careful review of *Allen,* we conclude the People have the better view. As we will explain, the strong governmental interest in protecting the public through the proper confinement and treatment of

SVP's—an interest not significantly undermined by allowing a competent defendant to testify over his counsel's objection—would be substantially impeded by recognizing an SVP's right to delay or avoid targeted confinement and treatment for a sexually violent mental disorder because his mental problems make him incompetent to stand trial.

To highlight the considerations that distinguish this case from *Allen*, we begin with a detailed analysis of our recent decision.

### A. *The Right to Testify Under* Allen

*Allen*, like this case, concerned a jury trial to determine whether the defendant (Allen) required recommitment as an SVP. The prosecution presented three mental health experts who had reviewed extensive background documentation, and who had either interviewed Allen or treated him at Atascadero. (*Allen, supra*, 44 Cal.4th 843, 849.)

Through this testimony, the People established the following criminal history: Allen was convicted of committing forcible rapes against two women he did not know by entering their vehicles and using weapons to threaten them with harm. Allen also attacked female victims in three other incidents with which he was never charged. They involved a physical assault on an acquaintance in her car, a sexual assault on someone he met in a friend's apartment, and another sexual assault on a teenager he met outside a store. (*Allen, supra*, 44 Cal.4th 843, 850–851.)

All three expert witnesses described Allen's behavior in custody. Notably, he had a long history of sexual misconduct toward female staff in both prison and Atascadero (e.g., staring at them, stalking and sexually propositioning them, exposing his penis, and masturbating in their presence). He denied such acts, and would not stop after being rebuked. He also believed the women he harassed were in love with him. In addition, the experts testified about Allen's poor treatment progress. He had not graduated beyond the early phases of the program, and denied committing any sexual crimes. He often refused medication, saying it was unnecessary and dangerous. Sometimes, he took medication only at low doses and in exchange for special privileges. (*Allen, supra*, 44 Cal.4th 843, 851–854.)

In testifying that Allen met the standards for recommitment as an SVP, the experts made clear they relied not only on the defendant's past conduct (i.e., adjudicated and unadjudicated crimes, and sexual misconduct in custody), but also on numerous other factors (e.g., lack of remorse or empathy, denial and deceit, delusional and confused thoughts, and poor treatment progress). The consensus from the expert witnesses at trial was that Allen suffered from a

diagnosed mental disorder consisting of paraphilia, psychosis, and antisocial personality disorder. Because his condition had not materially improved while hospitalized, he was viewed as posing a continued high risk of offense. (*Allen, supra,* 44 Cal.4th 843, 852–854.)[15] Despite this expert evidence of Allen's substantial mental disorders, Allen made, so far as appears, no claim that his mental state rendered him incompetent to participate and assist in his SVP trial.

During trial, the court learned that Allen sought to testify against counsel's advice. Such proffered testimony covered three topics: (1) Allen's claim that his victims had consented to the sex acts underlying his criminal convictions and uncharged crimes, (2) physical side effects that made him resist taking medication, and (3) his insistence that his sexual conduct in custody was prompted by the flirtatious behavior of female staff. Counsel alluded to certain tactical reasons for objecting to his client's testimony under such circumstances, including its " 'counterproductive' " nature and the prospect of damaging rebuttal. (*Allen, supra,* 44 Cal.4th 843, 856–857.) The court deferred to counsel. Hence, no testimony by Allen, or by any other defense witness, was introduced. The jury ultimately found Allen to be an SVP under the Act. (44 Cal.4th at p. 857.)

On review, this court agreed with Allen that he had a federal and state constitutional right to testify at trial, and that counsel lacked the ultimate authority to overrule that decision. (*Allen, supra,* 44 Cal.4th 843, 848, 863, fn. 14, 870.) However, our analysis was carefully tailored to the substance of the right being asserted and the nature of the interests being weighed.

At the outset, we made clear that Allen did not have the same fundamental right as a criminal defendant to testify over counsel's objection. (See *People v. Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710].) *Allen* explained that proceedings to commit an individual as an SVP serve to protect the public and are civil in nature. Hence, various constitutional rights afforded to defendants in criminal trials simply do not apply in this context. (*Allen, supra,* 44 Cal.4th 843, 860.) However, because commitment under the Act involves significant restrictions on liberty, *Allen* assessed the claimed right to testify in due process terms. The four-part balancing test commonly used for this purpose was applied. (*Allen,* at pp. 862–863.)

The first factor concerned "the private interests at stake." (*Allen, supra,* 44 Cal.4th 843, 863.) *Allen* observed that commitment under the Act affects significant interests, including liberty, reputation, and freedom from unwanted

---

[15] Two of the three witnesses at Allen's trial also diagnosed him with cocaine dependence. The evidence showed cocaine use in almost all of his criminal offenses, including the rape convictions. (*Allen, supra,* 44 Cal.4th 843, 850–854.)

treatment. These interests, *Allen* concluded, weighed in favor of adopting all reasonable procedures to prevent their erroneous deprivation, including a right to testify where counsel objects.

Second, *Allen* considered "the risk, in the absence of a right to testify, of an erroneous finding that the defendant is a sexually violent predator and the probative value, in reducing this risk, of allowing him or her to testify over the objection of counsel." (*Allen, supra,* 44 Cal.4th 843, 863.) *Allen* observed that an SVP's testimony at trial "typically will concern his or her conduct." (*Id.* at p. 866.) In other words, a defendant who testifies over counsel's objection at trial would describe the sexually violent offenses of which he was convicted, any unadjudicated crimes, and any misconduct or other relevant behavior in custody. *Allen* explained that such information is relevant to the " 'foundation' " of the SVP finding insofar as it supports or undermines expert opinion at trial on whether the defendant is mentally disordered and dangerous. (*Ibid.*)

Along these lines, *Allen* acknowledged that the defendant's testimony, even if truthful from his perspective, could harm his case if it confirms expert opinion that he suffers from a dangerous and disordered view of reality. Allen, for instance, sought to testify that some of his victims either consented to or provoked his sexual crimes and misconduct. The clear implication was that the risks inherent in such testimony are often present when counsel decides not to call his client to the stand. (*Allen, supra,* 44 Cal.4th 843, 865–866 & fn. 16.) Nevertheless, *Allen* observed that attorneys are not infallible in making such assessments. For this reason, *Allen* could not eliminate the possibility that a defendant testifying against counsel's advice might "raise a reasonable doubt concerning the facts underlying the experts' opinions." (*Id.* at p. 866.) Guaranteeing a right to testify over counsel's objection, even on the narrow range of issues to which such testimony relates, could conceivably reduce the risk of error, at least in the latter cases. Hence, *Allen* viewed this factor as favoring such a constitutional right to testify.

Third, *Allen* considered " 'the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " (*Allen, supra,* 44 Cal.4th 843, 866.) *Allen* highlighted the "strong interest" in protecting the public from SVP's, and in confining and treating them for the mental disorders that predispose them to reoffend. (*Ibid.*) *Allen* theorized that, at least where the defendant's testimony materially enhances the facts supporting expert opinion at trial, his participation as a witness over counsel's objection might help secure an accurate SVP finding. Because such a constitutional right would serve the state's interest in identifying persons requiring commitment under the Act, this factor did not undercut Allen's due process claim.

As to any fiscal and administrative burdens that might arise in such cases, *Allen* observed they were "de minimis." (*Allen, supra*, 44 Cal.4th 843, 867.) *Allen* noted, for instance, that where the defendant testifies over counsel's objection and such testimony proves to be beneficial to his case, the People must decide whether to present additional evidence in rebuttal. *Allen* suggested that this circumstance did not add to the burden that the People already bore in responding to defendants who testify at SVP trials *with* counsel's consent. Likewise, the constitutional right claimed by Allen would not lengthen the proceedings or increase costs except in that "subset of cases" in which the defendant rejects counsel's advice and testifies. (*Ibid.*)

The fourth factor that *Allen* addressed was " 'the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official.' " (*Allen, supra*, 44 Cal.4th 843, 868.) *Allen* reiterated that a defendant should be allowed to testify no matter how "strategically misguided" his decision seemed to be. (*Id.* at p. 869.) In that situation, the state had "no interest" in treating him merely as a spectator, or in requiring that his story be filtered through counsel or other witnesses. (*Ibid.*) Such concerns were found to favor Allen.

Based on its analysis of the competing interests, *Allen* concluded that there was a due process right to testify over counsel's objection, and that it had been violated in that case. *Allen* further determined, however, that the error did not require reversal, because it was harmless beyond a reasonable doubt. The reason was that the facts to which Allen sought to testify were largely tangential to the jury's determination that he was a mentally disordered and dangerous sexual offender. According to *Allen*, no reasonable juror would have rejected the strong expert testimony in this regard. Hence, the judgment recommitting Allen as an SVP was affirmed. (*Allen, supra*, 44 Cal.4th 843, 870–875.)

### B. *Defendant's Mental Incompetence Claim*

We agree with the People that, notwithstanding *Allen*, defendant has not carried his "heavy burden" of invalidating efforts to recommit him under the SVPA based on the trial court's refusal to decide his mental competence to stand trial. (*Otto, supra*, 26 Cal.4th 200, 209.) Contrary to what both defendant and the dissent would have us conclude, *Allen, supra*, 44 Cal.4th 843, is distinguishable in material respects. The due process right to testify recognized there, and the considerations supporting it, are substantially different from those present here. No issue was raised in the SVP trial itself, or argued or addressed on review, that Allen was mentally incompetent to stand trial, such that he could not understand the proceedings or assist in his

defense. The People therefore ask that we assess the relevant due process factors anew, guided by the general principles discussed in *Allen*, while considering the special concerns raised by the complete bar to trial asserted here. We do so now.

█ The liberty and dignitary interests affected by commitment under the SVPA—which appeared first and fourth, respectively, on *Allen*'s list—are no less significant here than in any other civil commitment case. To a greater or lesser extent, a mentally incompetent defendant may be in the position of "filtering" his contribution in an SVP proceeding through counsel, experts, and other witnesses. (*Allen, supra*, 44 Cal.4th 843, 869.) Even so, the defendant in an SVP trial is entitled to a fair and accurate determination of his status as an SVP, under procedures assuring that his liberty and other personal rights are not erroneously impaired.

Nevertheless, defendant overstates the risk of error in the present case. Defendant insists that only a mentally competent person can meaningfully contribute to his defense by providing counsel and mental experts with relevant firsthand information that could help show he is not mentally disordered or dangerous, and that could be used to rebut hearsay and other evidence used against him at trial. However, as *Allen, supra*, 44 Cal.4th 843, 866, made clear, the nature of the issues, evidence, and findings in an SVP proceeding prevents *any* defendant from playing much more than a supporting role. His account of his own history and conduct may supplement the foundation on which experts rely in forming their opinions. But it is the combined substance of such opinion evidence, including all the other information on which it is based, that resolves the critical question whether, "as of the date of the trial, defendant had a mental disorder that made it likely he would engage in sexually violent criminal behavior." (*Id.* at p. 873.) Thus, any chance that an SVP's mental incompetence would significantly impair his contribution to his defense seems relatively attenuated.

Nor can we ignore the numerous procedural safeguards available to prevent an erroneous commitment in *any* SVP case, regardless of the contribution the particular defendant is willing or able to make. First, during trial, no defendant, including one who may be mentally incompetent, must proceed without "the assistance of counsel," or without "the right to retain experts or professional persons to perform an examination" on his behalf. (§ 6603, subd. (a).) Even *Allen* recognized that, as a general rule, such "mandatory representation," coupled with expert assistance, "generally is beneficial" to the defense. (*Allen, supra*, 44 Cal.4th 843, 868.) Other heightened statutory requirements, like jury unanimity and the reasonable doubt standard of proof, help mitigate the risk that an incompetent person would be erroneously adjudicated as an SVP in the first place.

Second, the circumstances underlying the SVP determination are monitored over time to determine whether a material change has occurred and whether continued commitment is warranted. Under the current scheme, persons adjudicated and confined as SVP's—including, presumably, those who may have been incompetent at trial—must have their mental condition examined "at least once every year." (§ 6605, subd. (a).) An annual report on whether the person "currently meets the definition of a sexually violent predator" must be filed with the committing court. (*Ibid.*) Such defendant may petition for conditional release or unconditional discharge with, or without, the authorization or concurrence of the DMH. (See §§ 6605, subds. (b)–(d), 6608, subd. (a).) Defendants involved in this process are entitled to assistance from mental health experts and counsel. (See §§ 6605, subds. (a) & (d), 6608, subd. (a).) As a practical matter, such provisions mitigate the effects of any "error" in the commitment proceeding attributable to the reduced participation of a mentally incompetent SVP..For all these reasons, we cannot say that the risk-of-error factor weighs heavily toward finding the claimed due process right.

The most critical factor, of course, involves the " 'government[al] interest[s]' " that weigh against allowing SVP's to avoid being tried or committed while mentally incompetent—an issue that *Allen, supra,* 44 Cal.4th 843, 866, did not confront or decide. Chief among these is the "strong interest in protecting the public from sexually violent predators, and in providing treatment to these individuals." (*Ibid.*) As we have seen, such persons include those who have been convicted of qualifying sexually violent offenses, who have been diagnosed with mental disorders that seriously impair volitional control, and who present a substantial and credible risk that they will commit sexually violent predatory crimes if released. The Legislature has set forth comprehensive and detailed means for providing specialized treatment to persons adjudicated and committed as SVP's. In the process, as the SVPA provides, they are housed in secure facilities specifically dedicated to the confinement and treatment of persons whose mental disorders make them likely to commit violent predatory sexual offenses.

The state's interest in enforcing these procedures, and in protecting the public, would be substantially impaired if an alleged SVP could claim, based on his diagnosed mental disorders, that he was too incompetent to undergo a trial leading to such targeted confinement and treatment. Indeed, as the exhibits supporting defendant's writ petition suggest, we can reasonably assume that significant potential overlap exists between those mental disorders that qualify someone for commitment as an SVP, on the one hand, and those that produce an inability to comprehend the proceedings or assist in one's defense on the other. Here, all three experts diagnosed defendant with a similar condition (bipolar and/or schizoaffective disorder with paranoid delusions, mood disorders and psychotic features). Two of them linked this

disorder to his SVP diagnosis, while the third one found it affected his competence to stand trial. To allow anyone and everyone in this situation to seek a competence determination could require unknown numbers, possibly scores, of SVP commitment trials to be stayed indefinitely, and perhaps permanently, unless and until competence was restored under circumstances not involving confinement and treatment under the SVPA. Such concerns weigh heavily, and in fact dispositively, against recognition of a due process right of this kind.

We are not the first court to reach this result. Similar public safety concerns have been expressed in an unbroken line of cases from other states—states with commitment schemes that closely resemble the SVPA. These cases make clear that mentally incompetent persons may be tried, confined, and treated as SVP's. No due process right to avoid trial on mental competence grounds has been found. Unlike the instant Court of Appeal, we do not read the out-of-state cases as relying solely on the civil nature of the proceedings, or believe their views can be ignored. (See *Nieves, supra,* 846 N.E.2d 379, 385–386; *In re Commitment of Fisher* (Tex. 2005) 164 S.W.3d 637, 653–654; *In re Commitment of Luttrell* (Wis.Ct.App. 2008) 754 N.W.2d 249, 251–252; *In re Detention of Ransleben* (2006) 135 Wn.App. 535 [144 P.3d 397, 398–399]; *State ex rel. Nixon v. Kinder* (Mo.Ct.App. 2003) 129 S.W.3d 5, 8–10 (*Kinder*); see also *In re Detention of Cubbage* (Iowa 2003) 671 N.W.2d 442, 445–448; cf. *In re Commitment of Branch* (Fla.Dist.Ct.App. 2004) 890 So.2d 322, 326–328 [declining to find general due process right not to be tried as mentally incompetent SVP, but preventing state from relying solely on hearsay evidence of uncharged crimes to commit such persons as SVP's].)

Two of these decisions are particularly instructive. In *Nieves, supra,* 846 N.E.2d 379, which the trial court invoked in the present case, the Supreme Judicial Court of Massachusetts balanced the competing interests, as we do here, to determine whether due process prevented a defendant who had been found mentally incompetent from being tried and civilly committed under the state's Sexually Dangerous Persons Act. The liberty interests were deemed substantial, especially since the scheme contemplated commitment for an indefinite term. Nevertheless, the court held that due process was not offended by requiring the mentally incompetent defendant, while represented by counsel, to undergo a commitment trial: "[T]he defendant's interest must, with appropriate safeguards, yield to the Commonwealth's paramount interest in protecting its citizens. We see no reason why the public interest in committing sexually dangerous persons to the care of the treatment center must be thwarted by the fact that one who is sexually dangerous also happens to be incompetent." (*Nieves, supra,* at p. 385.)

For similar reasons, the appellate court in *Kinder, supra,* 129 S.W.3d 5, held that trial should not have been stayed under Missouri's version of the

SVPA to determine the defendant's mental competence. The court noted that the "very nature of civil commitments" is to provide treatment for those who are dangerous to themselves or others because they suffer from a mental disorder that prevents them from comprehending and responding to reality. (*Kinder*, at p. 8.) The court observed that due process permits the civil commitment and confinement of criminal defendants found chronically incompetent to stand trial. (*Id.* at p. 10, citing *Jackson v. Indiana* (1972) 406 U.S. 715, 738 [32 L.Ed.2d 435, 92 S.Ct. 1845].) *Kinder* thus found nothing wrong with allowing a mentally incompetent person whose disorders involve sexual dangerousness to be committed, not for incompetence, but *as an SVP*, to afford him the most appropriate treatment and provide the public with the greatest protection. A contrary approach, the court said, would "thwart the proper exercise of legislative authority for the health and welfare of the state's citizens . . . ." (*Kinder*, at p. 10.) For these reasons, *Kinder* held, the SVP defendant there failed to show that he had a due process right not to be tried while mentally incompetent.

No California case addresses whether a mentally incompetent person can be tried and committed as an SVP. However, in *People v. Angeletakis* (1992) 5 Cal.App.4th 963 [7 Cal.Rptr.2d 377] (*Angeletakis*), the Court of Appeal declined to find such a due process right under closely related circumstances. There, the defendant had been found not guilty by reason of insanity of a felony offense, and committed to Patton State Hospital. Several years later, during a hearing to extend his commitment for the third time (see Pen. Code, § 1026.5), the defendant claimed through counsel that he was mentally incompetent to proceed. Without hearing any evidence on the issue, the trial court rejected the claim. At the ensuing trial, several experts testified that the defendant was a paranoid schizophrenic, that he was delusional and dangerous, and that his deteriorating condition was not always helped by medication. The jury found that the defendant presented a substantial danger of physical harm to others if placed in an unsupervised setting. Commitment was extended for two years. (*Angeletakis, supra*, at pp. 966–967.)

On appeal, the court rejected any suggestion that the defendant was entitled to the same statutory procedures or constitutional rights that applied to mentally incompetent persons being tried in a criminal case. Rather, the court examined and weighed the factors generally deemed relevant for determining the nature of due process protections in civil commitment proceedings. The court perceived little risk of error in light of the procedural safeguards available under the particular statutory scheme, including the right to counsel. The court also observed that such provisions provided for confinement and treatment under conditions designed to address the defendant's mental health concerns. On balance, no due process right to prevent recommitment on incompetence grounds was found. Only "minimal protection" would be gained by suspending trial until the defendant could "understand the nature of

the proceedings and assist in the conduct of his 'defense.' " (*Angeletakis, supra*, 5 Cal.App.4th 963, 971.)

Finally, we observe that substantial "administrative burdens" and practical difficulties appear to arise if a convicted sexually violent offender who qualifies as an SVP cannot be tried and committed as such while mentally incompetent. (*Allen, supra*, 44 Cal.4th 843, 867.) It bears emphasis that the SVPA includes no provisions for incompetency proceedings in the context of commitment trials. The People thus contend that if the defendant is found incompetent to stand trial, and all proceedings under the SVPA are suspended as a result, courts are left without clear statutory guidance on such issues as the nature and length of any permissible placement, the provision of any treatment while the person remains incompetent, and the availability of civil commitment under another statutory scheme if competence is never regained. The People suggest that, while the Court of Appeal sought to "fill the gap" by adopting procedures reminiscent of those used for incompetent *criminal* defendants under Penal Code section 1367 et seq., its decision largely provides no satisfactory answers to these questions.

We agree that any effort to apply Penal Code section 1367 et seq. under circumstances suggested by the Court of Appeal only serves to highlight the uncertainty that would arise were we to recognize a due process right not to be tried as an incompetent SVP. For example, the nature of any placement under the statutory scheme for incompetent criminal defendants depends in large part upon the "charges" pending against the person when the incompetence finding is made and criminal proceedings are suspended. It is uncertain how such a "nature of charges" distinction would apply to SVP defendants, who have already been *convicted* of, and imprisoned for, one or more sexually violent crimes.

It also is not clear where incompetent SVP defendants would be confined pending their restoration to competency, or what treatment, if any, they would be offered during that time. We note that an incompetent *criminal* defendant "charged with a violent felony" may not be placed in a state hospital or other treatment facility unless it either has a "secured perimeter" or is "locked and controlled," and the court finds that public safety will be protected in the particular case. (Pen. Code, § 1370, subd. (a)(1)(D).) Here, the Court of Appeal ordered that defendant be moved to "a state hospital for the care and treatment of the mentally disordered" if he was found incompetent to undergo another SVP trial.

However, neither the Penal Code provisions on which the Court of Appeal so loosely relied, nor the provisions of the Court of Appeal's order, track the definition of "secure facility" under the SVPA, including its exclusions and

limitations on the state mental hospitals that may be used to house SVP's both during and after trial. (§ 6600.05.) Nor do the criminal incompetency statutes provide for special treatment "protocol[s]," as set forth in the SVPA. (§ 6606, subd. (c).) These strict standards and protocols, whose purpose is to keep the community safe from the sexually predatory propensities of persons who qualify as SVP's, also help protect patients and workers inside the state mental hospital system. The danger to these groups would be enhanced if persons allegedly too incompetent to be tried and committed as SVP's were to be housed indefinitely, and perhaps permanently, in places not designed and staffed to deal with the peculiar risks they pose. Thus, as the People suggest, we would have no relevant template if we allowed SVP defendants to avoid trial while incompetent. These concerns seem particularly troubling where, as here, the defendant has already been committed under the SVPA, probable cause has been found that he is likely to reoffend, he has been ordered to remain in a "secure facility" pending trial, and proceedings to recommit him and continue his placement are underway.[16]

 Balancing all the foregoing factors, and placing special weight on the "paramount" interest in public safety, we conclude that due process does not require mental competence on the part of someone undergoing a commitment or recommitment trial under the SVPA. (*Nieves, supra*, 846 N.E.2d 379, 385.)

## IV. CONCLUSION

We reverse the judgment of the Court of Appeal.

George, C. J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**MORENO, J., Dissenting.**—I respectfully dissent.

"Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a

---

[16] At oral argument in this court, counsel debated the mental health treatment available at a secure facility, like Coalinga State Hospital, for someone who was mentally incompetent when adjudicated as an SVP. Defendant seems concerned that—even after trial is complete and competence to assist therein is no longer in issue—the mental condition underlying such incompetency could interfere with the sex offender treatment program required under the SVPA, and that such condition might go unaddressed during the commitment term. On the one hand, we decline to question the benefits the Legislature obviously believed both society and the SVP would gain from treatment targeting his dangerous sexual disorders, or to assume that any person committed as an SVP is unable, by reason of his mental condition, to benefit from such treatment. On the other hand, we see nothing in the SVPA to prevent treatment from being provided for the *full range* of diagnosed disorders that might impair the SVP's receptivity to sexual therapies, or that might otherwise enhance his prospect for restoration to full mental health.

criminal defendant while he or she is mentally incompetent. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 846 [48 Cal.Rptr.3d 1, 141 P.3d 135].) An individual is mentally incompetent to stand trial "if, as a result of mental disorder or developmental disability, the defendant is *unable to understand* the nature of the criminal proceedings or to *assist* counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a), italics added.) This deeply embedded due process principle arises from a repugnance, both legal and moral, in forcing a criminal defendant into a trial that may result in substantial loss of liberty when the defendant is incapable of understanding the proceeding, or assisting in the defense. In my view, it is equally repugnant to force an individual to stand trial as a sexually violent predator (SVP) and face a potential lifetime term of civil commitment when that person lacks the competence to understand, or participate meaningfully in, the Sexually Violent Predator Act (SVPA) proceeding. (Welf. & Inst. Code, § 6600 et seq.; statutory cites are to this code unless otherwise designated.) I believe that this conclusion is compelled by our decision in *People v. Allen* (2008) 44 Cal.4th 843 [80 Cal.Rptr.3d 183, 187 P.3d 1018] (*Allen*).

The majority characterizes the right at issue as "an SVP's right to delay or avoid targeted confinement and treatment for a sexually violent mental disorder because his mental problems make him incompetent to stand trial." (Maj. opn., *ante*, at p. 820.) Such characterization *assumes* that SVP's would assert claims of incompetence merely to delay or avoid commitment. Not so. The right at issue here is the due process right to be competent at an SVPA proceeding. Furthermore, the substantial safeguards in criminal cases against claims of incompetence made simply for purposes of delay would also apply in the SVPA context. For instance, as is true of criminal trials, the question of competency in SVPA proceedings would not be raised by the defendant· but by the court or the defendant's attorney. (Pen. Code, § 1368.) Moreover, even when counsel expresses a doubt about competency, the trial court need only conduct a competency hearing when it " 'is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 524 [75 Cal.Rptr.3d 588, 181 P.3d 947].) Additionally, as in criminal proceedings, an SVP's competence would be evaluated by mental health professionals who can certainly assess whether an individual is malingering.

Along these same lines, I reject the majority's speculation that recognizing the right to be competent at an SVPA proceeding would open the floodgates to incompetency claims. (Maj. opn., *ante*, at pp. 825–826.) Few individuals would be deemed incompetent to undergo SVPA trials. The reason is simple:

All individuals in SVPA proceedings have been convicted of criminal offenses and were thus necessarily mentally competent at the time of the conviction. Thus, only those defendants who could demonstrate that they had become incompetent while serving their sentences could assert a competency claim.

As the majority acknowledges, *Allen* provides a four-part balancing test with which we determine what process is due SVP's. (Maj. opn., *ante*, at p. 819.) " '(1) [T]he private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest though the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official.' " (*Allen, supra*, 44 Cal.4th at pp. 862–863.)

The majority concedes that "[t]he liberty . . . interest[] affected by commitment under the SVPA . . . [is] no less significant here than in any other civil commitment case." (Maj. opn., *ante*, at p. 824.) Having made this concession, however, the majority quickly minimizes the importance of the liberty interest. The majority is wrong. That interest is as significant, if not more significant here, than it was in *Allen*. It is worth pausing and reflecting upon what we said about that interest a little more than two years ago.

"We begin with the private interests at stake. As we noted in [*People v.*] *Otto* [(2001)] 26 Cal.4th 200 [109 Cal.Rptr.2d 327, 26 P.3d 1061], 'the private interests that will be affected by [a finding that the defendant continues to be a sexually violent predator] are the significant limitations on [the defendant's] liberty, the stigma of being classified as [a sexually violent predator], and subjection to unwanted treatment. [Citation.]' (*Id.* at p. 210.) . . . '[T]he California Legislature has recognized that the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction.' (*In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201] . . . .) Thus, the first factor weighs heavily in favor of providing all reasonable procedures to prevent the erroneous deprivation of liberty interests." (*Allen, supra*, 44 Cal.4th at p. 863, fn. omitted.)

If those observations were true with respect to a defendant's right to testify at his or her SVPA proceeding, they apply with even greater force to a defendant's right to be competent at that proceeding. A defendant who is unable to understand the nature of the proceeding or to meaningfully assist counsel is subject to the same deprivation of liberty, the same stigma of being classified as an SVP and the same subjection to unwanted—and, because incompetent, ineffective—treatment.

Nor is it an answer, as the majority asserts, that competency is not required because "the nature of the issues, evidence, and findings in an SVP proceeding prevents *any* defendant from playing much more than a supporting role." (Maj. opn., *ante*, at p. 824.) I find no support in *Allen* for such a global characterization of the defendant's role in an SVPA proceeding.[1] To the contrary, in discussing the importance of allowing a defendant to testify, even over the objection of defendant's counsel, we observed: "[A]s has been recognized in cases in which a sexually violent predator has asserted the privilege against self-incrimination, the defendant's participation in the proceedings, through pretrial interviews and testimony at trial, generally enhances the reliability of the outcome. Moreover, as observed in *Otto, supra*, 26 Cal.4th 200, if critical information, such as the details surrounding the commission of the predicate offenses, is questionable, 'a significant portion of the foundation of the resulting [sexually violent predator] finding is suspect.' (*Otto, supra*, 26 Cal.4th at pp. 210–211.) Because the testimony of a defendant typically will concern his or her conduct, this testimony may relate to information that is critical to the experts' testimony. . . . In some cases, the defendant's testimony may raise a reasonable doubt concerning the facts underlying the experts' opinions. *Accordingly, in every case there exists a risk that allowing counsel to preclude the defendant from testifying will lead to an erroneous deprivation of rights.* Guaranteeing the defendant a right to testify,

---

[1] Apparently, the majority's characterization of the defendant's role in an SVPA proceeding as "supporting" is based on the particular circumstance in *Allen* that Allen's testimony would not have been particularly useful to him. But even in that circumstance, we rejected the argument that the "supporting role" status of a defendant is sufficient to overcome the risk of deprivation of the liberty interest. "Although . . . we agree with the Court of Appeal that defendant's testimony would not have assisted him in preserving his liberty interests in this case, here we seek to establish a rule of general application in proceedings under the SVPA. '[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions.' (*Matthews v. Eldridge* (1976) 424 U.S. 319, 344 [47 L.Ed.2d 18, 96 S.Ct. 893].) Therefore, we consider generally whether allowing a defendant in a proceeding under the SVPA to testify over the objection of his or her counsel may aid the defendant in preventing the erroneous deprivation of liberty interests, rather than whether the right would aid the particular defendant before us." (*Allen, supra*, 44 Cal.4th at p. 865.) A fortiori, an incompetent defendant, by definition, cannot play any role—whether starring or supporting—in preventing the erroneous deprivation of his liberty interests.

even over counsel's objection, will mitigate this risk." (*Allen, supra,* 44 Cal.4th at pp. 865–866, fn. omitted, italics added.)

If, then, we recognized in *Allen* that a defendant's testimony might be potentially game changing with respect to the liberty interest—and such testimony is but one aspect of the defendant's potential participation in an SVPA proceeding—how much more vital is it that a defendant be competent during that proceeding not just to testify but to assist counsel in evaluating and responding to the state's case against the defendant? The answer is clear: Forcing an incompetent defendant to undergo an SVPA trial will, in *every* such case, create a risk of depriving the defendant of his or her liberty interest. Thus, this factor weighs mightily in favor of recognizing a due process right to be competent during an SVPA trial.

The second *Allen* factor, which balances the risk of deprivation of the liberty interest under current procedures against the probable value of additional procedural safeguards, also weighs heavily in favor of recognizing a right to be competent in SVPA proceedings. As noted, an incompetent defendant is powerless to vindicate his or her liberty interests under the current procedural regime, which does not contain a process for guaranteeing competency. The majority uses this very lack of a safeguard as a reason to deny it. The majority argues that, because the SVPA is silent as to the issue of incompetency, no "relevant template" exists by which to process incompetent SVP defendants. (Maj. opn., *ante,* at p. 829.) I strongly disagree. If a court cannot remedy a due process violation, then judicial power is for naught. It is well established that courts possess an inherent power to adopt procedures which promote due process rights in the face of statutory silence. (*Citizens Utilities Co. v. Superior Court* (1963) 59 Cal.2d 805, 812–813 [31 Cal.Rptr. 316, 382 P.2d 356] [it is "beyond dispute that 'Courts have inherent power . . . to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council' "].)

Most relevantly, in *James H. v. Superior Court* (1978) 77 Cal.App.3d 169 [143 Cal.Rptr. 398], the Court of Appeal held that "in the absence of any statutory procedure for so doing the juvenile court has the inherent power to determine a minor's mental competence to understand the nature of [juvenile] proceedings . . . and to assist counsel in a rational manner at that hearing." (*Id.* at p. 172.) The court in *James H.* relied on its "inherent powers to formulate procedures which have not yet attained legislative approval" (*id.* at p. 176) and referred the trial court to Penal Code section 1367. Here, too, Penal Code section 1367 et seq., provide an established framework for assessing incompetency and dealing with SVPA defendants who are found to be incompetent. I agree with the Court of Appeal that "this is an appropriate

case for the exercise of [this court's] inherent power to look to [Penal Code section 1367] in order to fill the gap in the SVPA, so as to enable the Act to function in a constitutional manner."

The majority concedes that the dignitary interest—the fourth *Allen* factor—weighs in defendant's favor in this case. Again, it is worth pausing to examine what that interest entails as we explained it in *Allen*. The central facets of the dignitary interest are (1) " 'informing individuals of the nature, grounds, and consequences of the action,' " and (2) " 'enabling them to present their side of the story before a responsible government official.' " (*Allen, supra,* 44 Cal.4th at pp. 862–863.) Of course, if a defendant is incompetent for the purposes of Penal Code section 1367—unable to understand the proceedings or to assist counsel—then, by definition, that individual cannot be informed of the nature, grounds and consequences of the proceeding. Nor would that individual have the capacity to present his or her side of the story. Again, it matters no more in the competency context than in the right to testify whether "a defendant generally can communicate his or her version to and through the experts and counsel and through other witnesses . . . ." (*Allen, supra,* 44 Cal.4th at p. 869.) In either case, denying a defendant the right to present his or her side of the story "relegate[s]" the defendant "to the role of a mere spectator, with no power to attempt to affect the outcome." (*Ibid.*) Thus, compelling an incompetent defendant to endure an SVPA commitment proceeding thoroughly violates his dignitary interests.

Against these three factors that weigh in favor of a due process right to competency in SVPA proceedings, the majority cites the governmental interest—factor (3)—which it identifies as public safety. (Maj. opn., *ante,* at p. 825.) According to the majority, " 'the strong [governmental] interest in protecting the public' " (*ibid.*) would be "substantially impaired" if courts recognized an SVP's right to a competency determination (*id.* at pp. 825–826). This is true, the majority reasons, because SVP's "present a substantial and credible risk that they will commit sexually violent predatory crimes if released." (*Id.* at p. 825.)

It is, of course, true that protecting the public is the paramount aim of the SVPA but it is not true that recognizing an SVP's right to be competent at an SVPA proceeding would result in the release of deranged sexual predators on a defenseless public. Rather, a defendant found to be incompetent would remain civilly committed in a secure facility while receiving treatment designed to restore competency and, once competency was restored, would then be subject to SVPA proceedings. The result: an unbroken internment, whereby the defendant would remain in custody while incompetent, or remain incarcerated as an SVP.

Indeed, civil commitment to restore competency would precede, not replace, any targeted SVP treatment. No confined SVP would be released until after a jury had determined that he or she was no longer dangerous. Defendants never restored to competency would be confined indefinitely, and while the majority expresses a concern that doing so would enable defendants to avoid trial, it fails to explain how this indefinite commitment would endanger the public. (Maj. opn., *ante,* at pp. 825–826.) The majority erroneously frames this issue as a choice between recognizing the right to be competent during an SVPA proceeding and compromising public safety. In fact, the real choice here is between shuffling incompetent defendants through SVPA proceedings and treating them in a secure environment until competence is restored. Thus, contrary to the majority's assertion, I do not find that the governmental interest in public safety outweighs the other three *Allen* factors that tip the scale toward recognizing a defendant's due process right to be competent.

Finally, I strongly disagree with the theme that runs through the majority opinion conflating the disorders which render one an SVP and those which render one incompetent to stand trial. In a breathtaking example of ipse dixit reasoning the majority asserts—without a shred of scientific evidence or a legal authority—that we can "reasonably assume" that "significant potential overlap exists" between those mental health disorders that quality someone for commitment as an SVP and those rendering one incompetent to stand trial. (Maj. opn., *ante,* at p. 825.)

This assertion is simply wrong as a matter of relevant statutory comparison. Under the SVPA, a defendant is deemed to be an SVP if the defendant has "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) A "diagnosed mental disorder" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (*Id.,* subd. (c).) Thus, the mental disorders which render one an SVP relate to sexual aberrations that increase the likelihood one will engage in sexually violent criminal behavior. By contrast, under Penal Code section 1367, "[a] defendant is mentally incompetent . . . if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a).) The two definitions are not congruent. An individual can be a pedophile or a rapist and thus suffer a mental disorder for purposes of the SVPA while remaining perfectly competent to understand the nature of, and

participate in, an SVPA proceeding.[2] Accordingly, I reject as unsupported the assertion by the majority that substantial overlap exists between those mental disorders that qualify an individual as an SVP and those rendering an individual incompetent.

In short, it is my view that the majority, under the pretext of distinguishing *Allen*, eviscerates that opinion. Of course, it is true that *Allen* did not address the competency issue we consider here, but that does not render the due process analysis we set forth in *Allen* inapplicable here. To the contrary, compelling an incompetent defendant to submit to an SVPA hearing is, if anything, a more serious due process violation than denying a competent defendant the right to testify on his own behalf at such proceeding. Denying a defendant the right to testify over counsel's objection implicates but one discrete aspect of the defendant's overall defense. By comparison, forcing an incompetent defendant to endure an entire SVPA proceeding impacts virtually every aspect of the defense. Not only would defendants be robbed of the opportunity to testify in a competent manner, they would also be deprived of the ability to communicate meaningfully with their attorneys and with the court, and to confront adverse witnesses. A mentally incompetent defendant is unable to dispute facts, challenge admissible hearsay evidence or contradict erroneous factual assumptions used by expert witnesses—factors the *Allen* court found critical to ensuring the reliability of the proceedings.

By contrast, recognizing a right to be competent in SVPA proceedings would provide a safeguard against the unsavory prospect of subjecting individuals who are not SVP's to SVPA confinement and treatment. Moreover, restoring to competence those who actually are SVP's would avoid the "futile" exercise of attempting SVPA treatment on incompetent subjects. (See Abrams et al., *The Case for a Threshold for Competency in Sexually Violent Predator Civil Commitment Proceedings* (2007) 28 Am. J. Forensic Psychiatry 7, 22–23 ["[A]ttempting to [treat the] behaviors of an SVP that precipitate within the matrix of a florid psychosis or severe cognitive impairment would prove futile. . . . [C]urrently available treatments for SVPs find [their] provenance in rational, goal-directed, even insightful cognition."].) Thus, contrary to the majority, no Pandora's box would be opened by extending the right to competency to defendants in an SVPA proceeding. Rather, competent SVP's who would benefit from treatment would receive it while those few

[2] The majority suggests that in this case there is significant overlap between the mental disorders that qualify defendant as an SVP and those that affect his competence. (Maj. opn., *ante*, at pp. 825–826.) I have examined the submissions by the three experts who diagnosed defendant and I am not wholly persuaded that this characterization is correct, but even if it is, as was true in *Allen*, the due process right to be competent in an SVPA proceeding is " 'shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions.' [Citation.]" (*Allen, supra*, 44 Cal.4th at p. 865.)

deemed to be incompetent would be restored to competency so that the issue of their SVP status could be determined and, if they were found to be SVP's, offered treatment.

For all these reasons, I must dissent.

Kennard, J., concurred.