# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Commitment of Weekly*, 2011 IL App (1st) 102276

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF BERNARD WEEKLY, LUIS TENORIO, TIMOTHY RICHARDSON, ALFRED EDWARDS, and ZACHARY HATTER (The People of the State of Illinois, Petitioner-Appellee, v. Bernard Weekly, Luis Tenorio, Timothy Richardson, Alfred Edwards, and Zachary Hatter, Respondents-Appellants.) |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2276 |
| Filed | September 16, 2011 |
| Rehearing denied | November 1, 2011 |
| Modified opinion filed | November 4, 2011 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In consolidated proceedings on petitions seeking the involuntary commitment of respondents under the Sexually Violent Persons Commitment Act, the appellate court answered three certified questions posed under Supreme Court Rule 308 by stating that the trial court had no inherent authority to order a fitness evaluation pursuant to respondents' requests where respondents did not have a statutory or constitutional due process right to such an evaluation. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 01-CR-80011, 07-CR-80012, 08-CR-80012, 09-CR-80005, 10-CR-80010; the Hon. Paul P. Biebel, Jr., Judge, presiding. |

| | |
|---|---|
| Judgment | Certified questions answered. |
| Counsel on Appeal | Law Offices of Chicago-Kent College of Law, of Chicago (Daniel T. Coyne, Matthew M. Daniels, and Elizabeth D. Leeb, of counsel), for appellants. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Katherine D. Saunders, Assistant Attorneys General, of counsel), for the People. |
| Panel | PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Justices Garcia and McBride concurred in the judgment and opinion. |

## OPINION

¶ 1 This matter is before us on interlocutory appeal pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 1, 1994) to consider three questions certified by the trial court. In separate petitions, the State sought the involuntary commitment of each of the respondents, Bernard Weekly, Luis Tenorio, Timothy Richardson, Alfred Edwards, and Zachary Hatter, under the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 *et seq.* (West 2004)). In each case, respondent's counsel[1] sought a fitness examination to determine if the respondent was fit and, if not, whether he could be restored to fitness. The trial court consolidated the cases for the purpose of ruling on the petitions for fitness examinations and denied the petitions. Respondents moved for a permissive interlocutory appeal pursuant to Rule 308, and the trial court granted respondents' motion, certifying three questions for review.

¶ 2 BACKGROUND

¶ 3 Respondents are five men who have been convicted of sexually violent offenses and have been subject to petitions seeking their commitment under the Act. Each respondent's background is set forth below.

---

[1]Respondents are all currently represented by the same counsel.

¶ 4                                    I. Bernard Weekly

¶ 5        On September 7, 2001, the State filed a petition to commit respondent Bernard Weekly as a sexually violent person pursuant to the Act. According to the petition, Weekly had three prior sexual convictions. On March 2, 1982, Weekly was convicted of unlawful restraint and sentenced to three years in the Illinois Department of Corrections (IDOC). On June 27, 1983, Weekly was convicted of rape and deviate sexual assault and sentenced to 15 years in the IDOC for each charge, to be served concurrently. On February 5, 1992, Weekly was convicted of attempted aggravated criminal sexual assault and sentenced to 20 years in the IDOC.

¶ 6        The petition claimed that Weekly had the mental disorders of "Paraphilia, Not Otherwise Specified (Non-consenting Sexual Partners)" and "Personality Disorder, Not Otherwise Specified with Antisocial Features." The petition alleged that Weekly was dangerous to others because his mental disorders created a substantial probability that he would engage in acts of sexual violence in the future. The petition further claimed that Weekly had a "lengthy history of mental problems dating back to age ten," had been prescribed a number of psychotropic medications, and had an extremely difficult time handling stress or situations in which his immediate needs were not met. The petition stated that Weekly had not sought sex offender treatment or substance abuse treatment while in the IDOC or on parole.

¶ 7        The petition also included a psychological evaluation prepared by Agnes R. Jonas, Psy.D., a clinical psychologist with the IDOC who evaluated Weekly on April 11, 2001. In her report, Dr. Jonas stated that Weekly gave consistently contradictory information, which appeared to be a deliberate distortion of the truth; this pattern was consistent with psychopathic antisocial personality disorder. She noted that Weekly mentioned that he heard the voice of his dead friend, "Tyrone," frequently, and she opined that the " 'use' " of Tyrone was "for the purpose of appearing more disturbed than is actually the case in order to manipulate the system to get his perceived needs met." Dr. Jonas placed Weekly's intellectual functioning in the "[b]orderline range."

¶ 8        On September 7, 2001, the court ordered Weekly detained by the Illinois Department of Human Services upon release from the IDOC pending a probable cause hearing. On October 5, 2001, the court found probable cause to believe that Weekly was a sexually violent person.

¶ 9        On January 30, 2007, the State requested a current evaluation of Weekly and on March 10, 2009, Jacqueline Buck, Psy.D., a licensed clinical psychologist with the IDOC, prepared a report detailing her evaluation of Weekly. Dr. Buck concluded that "Mr. Weekly suffers from the Axis I disorders of Paraphilia, Sexually Attracted to Non-consenting Females, Non-exclusive Type; Schizoaffective Disorder; Alcohol Dependence, Without Physiological Dependence, In a Controlled Environment; and Polysubstance Abuse (cocaine, marijuana, heroin), In a Controlled Environment; the Axis II disorders of Antisocial Personality Disorder, and Borderline Intellectual Functioning." Dr. Buck opined that Weekly's disorders made it substantially probable that he would engage in continued acts of sexual violence if he was released.

¶ 10            II. Luis Tenorio

¶ 11   On October 22, 2007, the State filed a petition to commit respondent Luis Tenorio as a sexually violent person pursuant to the Act. The petition claimed that Tenorio had been convicted of aggravated criminal sexual abuse and was sentenced to five years in the IDOC. The record[2] establishes that Tenorio was convicted on May 5, 2007, and that at one point during the pendency of his case, Tenorio was determined to be unfit to stand trial. The record further indicates that Tenorio was previously convicted of aggravated criminal sexual abuse on June 11, 2003, and that he was sentenced to three years in the IDOC for the offense. Again, Tenorio was found unfit to stand trial at one point during the pendency of that case.

¶ 12   The petition claimed that Tenorio had two mental disorders: "Pedophilia, Sexually Attracted to Females"; and "Pervasive Development Disorder, Not Otherwise Specified." The State claimed that the mental disorders made it substantially probable that he would engage in acts of sexual violence.

¶ 13   Attached to the petition was a psychological evaluation completed on October 12, 2007, by Ray Quackenbush, Psy.D., a "consultant psychologist" with Affiliated Psychologists, Ltd. (Affiliated), an independent company providing evaluation services to the IDOC. Dr. Quackenbush reported that his first interview with Tenorio was terminated after one hour. Dr. Quackenbush requested that prison personnel evaluate Tenorio for possible risk of suicide, after which Tenorio was kept in the prison infirmary for five days until he "calmed."

¶ 14   During his second interview, Dr. Quackenbush opined that Tenorio expressed himself in a way "consistent with someone who might be in the low average to borderline intelligence range of cognition." He reported that Tenorio had attended special education classes for his entire academic career and had been reported to behave as though he was 10 to 12 years old; Dr. Quackenbush agreed that "[h]is presentation [was] consistent with someone who suffers from a pervasive developmental delay."

¶ 15   On October 22, 2007, the trial court ordered Tenorio detained pending a probable cause hearing. On November 5, 2007, the court found that there was probable cause to believe that Tenorio was a sexually violent person.


¶ 16           III. Timothy Richardson

¶ 17   On August 21, 2008, the State filed a petition to commit respondent Timothy Richardson as a sexually violent person under the Act. According to the petition, Richardson had been convicted of two sexually violent offenses. Richardson was convicted of aggravated criminal sexual assault and home invasion and was sentenced to 10 years in the IDOC; the record indicates that the date of the conviction was December 17, 1987, and that at some point during the pendency of his case, Richardson was found unfit to stand trial. Additionally, on

---

[2]We relate each respondent's criminal history based on the petition and any certified statements of conviction attached to the petition. While the psychological evaluations of many of the respondents list a large number of other convictions, we do not include those here.

-4-

March 8, 2004, Richardson was convicted of attempted aggravated criminal sexual abuse and attempted robbery and was sentenced to five years in the IDOC.

¶ 18    The petition claimed that Richardson had been diagnosed with the following mental disorders: "Paraphilia NOS"; "Exhibitionism"; "Schizophrenia, Undifferentiated Type"; and "Antisocial Personality Disorder" and claimed that Richardson was dangerous to others because his mental disorders made it substantially probable that he would engage in acts of sexual violence.

¶ 19    Attached to the petition was a psychological evaluation prepared on August 18, 2008, by Phil Reidda, Ph.D., ABPP, a "consultant psychologist" with Affiliated. Dr. Reidda's report revealed that Richardson had received 314 behavioral incident reports between November 1, 1998, and May 24, 2007. Eighty-five of those incidents concerned assault or attempted assault of IDOC staff members and twenty involved issues of sexual misconduct. Dr. Reidda's report also recounted an incident occurring shortly before the evaluation was performed in which Richardson attacked an IDOC staff member. The report is not entirely clear, but it appears that Richardson faced criminal charges stemming from the attack and came before a trial court on July 16, 2008, at which point the court transferred him to a mental health facility for an evaluation of his fitness to stand trial. On July 18, 2008, Richardson was found fit to stand trial.[3]

¶ 20    On August 21, 2008, the trial court entered an order detaining Richardson pending a probable cause hearing. Richardson waived the time period requirements of the probable cause hearing and as of the time of the instant appeal has not had a probable cause hearing.

¶ 21                                    IV. Alfred Edwards

¶ 22    On September 22, 2009, the State filed a petition to commit respondent Alfred Edwards as a sexually violent person pursuant to the Act. The petition stated that on August 25, 2000, Edwards was convicted of attempted criminal sexual assault in two separate cases and was sentenced to seven years in the IDOC on each count, with the sentences to run concurrently. The record reveals that at some point during the pendency of his cases, Edwards was found unfit to stand trial and was involuntarily committed to a mental health facility.

---

[3]The report states that on July 16, 2008, "the court declared Mr. Richardson Not Guilty by Reason of Insanity (NGRI) and ordered his transfer to the Illinois Department of Human Services, Chester Mental Health facility for evaluation (in a secure setting) on whether or not he is capable of understanding a trial on these charges, at the conclusion of his current incarceration." We read the reference to "Not Guilty by Reason of Insanity" as a statement concerning Richardson's fitness to stand trial and not as a disposition of the charges, since the result was a transfer in order to obtain a fitness evaluation. We disagree with Richardson's characterization of the event, which is that Richardson "was found unfit to stand trial in 2008 during an aggravated battery to a correctional officer case in downstate Lee County. *** In that case, the Circuit Court of Lee County later found him to be not guilty by reason of insanity." There is no evidence in the record supporting this statement other than Richardson's petition for fitness evaluation.

¶ 23    The petition claimed that Edwards had been diagnosed with the following mental disorders: "Paraphilia, Not Otherwise Specified, Nonconsenting Persons" and "Schizophrenia, Undifferentiated, Chronic." The petition further claimed that Edwards' mental disorders made it substantially probable that he would engage in acts of sexual violence.

¶ 24    Attached to the petition was a psychological evaluation prepared by Dr. Quackenbush[4] on September 21, 2009. Dr. Quackenbush reported that he read Edwards a " 'Notice of Sexually Violent Persons Commitment Act Evaluation, Interview and Limits of Confidentiality and Privilege' " form, which included information that the interview was voluntary. Edwards told Dr. Quackenbush several times that Edwards was required to speak with him because Dr. Quackenbush was a doctor. Since Edwards did not appear to understand that the interview was voluntary, Dr. Quackenbush elected not to interview him. Dr. Quackenbush also related that Edwards was experiencing auditory and visual hallucinations, stating that he heard people in the room making jokes and that he saw Lucille Ball standing behind Dr. Quackenbush and waving.

¶ 25    Dr. Quackenbush additionally noted that Edwards had an "extensive" mental health history and was on forced medication; Edwards usually did not cooperate with taking medication, and, when he was not on medication, "he becomes quite violent and both attacks staff members and acts out sexually." Dr. Quackenbush revealed that Edwards had received 208 discipline tickets in the IDOC since March 2001, with 22 of them being assaults against IDOC staff and 6 being for sexual misconduct.

¶ 26    On September 22, 2009, the trial court ordered Edwards detained pending a probable cause hearing. As of the date of the instant appeal, the probable cause hearing has not yet occurred.

¶ 27                                    V. Zachary Hatter

¶ 28    On May 10, 2010, the State filed a petition to commit respondent Zachary Hatter as a sexually violent person pursuant to the Act. The petition set forth two convictions for sexually violent offenses. On November 22, 1991, Hatter was convicted of aggravated criminal sexual abuse and aggravated unlawful restraint and was sentenced to four years in the IDOC. The record reveals that during the pendency of his case, Hatter was found unfit to stand trial twice. On May 11, 2009, Hatter was convicted of aggravated criminal sexual abuse and was sentenced to a total of five years in the IDOC. Again, the record reveals that during the pendency of his case, Hatter was found unfit to stand trial three times.

¶ 29    The petition claimed that Hatter suffered from "Bipolar Disorder with Psychotic Features, Per Records," which predisposed him to commit future acts of sexual violence. Attached to the petition was a psychological evaluation prepared on May 5, 2010, by Vasiliki Tsoflias, Psy.D., a "consultant psychologist" with Affiliated. Dr. Tsoflias reported that he

---

[4]Dr. Quackenbush was the same psychologist who performed the psychological evaluation on Tenorio.

was unable to receive consent from Hatter to conduct the interview "due to Mr. Hatter's expression of overt delusional thoughts, manic symptoms, and inability to express an understanding of why he was being seen." Dr. Tsoflias recommended that Hatter be committed to a mental health facility rather than a sex offender treatment facility because "it appears Mr. Hatter's sexual acting out is the result of his psychosis rather than a sexual disorder."

¶ 30    On May 10, 2010, the trial court ordered Hatter detained pending a probable cause hearing. On May 12, 2010, Hatter waived his right to have a probable cause hearing within 72 hours of the filing of the petition. As of the time of the instant appeal, no probable cause hearing has occurred.

¶ 31                          VI. Petitions for Fitness Examinations

¶ 32    Respondents each filed a petition for a fitness examination. In each petition, respondents recounted their psychiatric diagnoses and the results of their psychiatric evaluations. The petitions also stated that respondents' counsel had attempted to discuss the allegations raised in the petition for commitment with each respondent, but was unable to communicate with any respondent due to the nature of each man's mental health disabilities. Finally, the petition claimed that respondents' counsel had a *bona fide* doubt as to each respondent's fitness to stand trial and that it was necessary to examine each respondent's fitness in order to preserve his due process guarantees.

¶ 33    The State responded to the petitions for fitness examinations, arguing in each case that respondents had no right to a fitness evaluation. Since all of the cases involved the same legal issue, the trial court consolidated the cases for the purpose of deciding the matter.[5] The parties came before the court for a hearing on the matter on December 18, 2009. Respondents argued that they were entitled to fitness evaluations because: (1) the trial court had the inherent authority to supervise the cases before it, (2) denial of the evaluations would deprive respondents of their right to due process, and (3) there was an implicit right to a fitness evaluation under the Act. On February 19, 2010, the court issued a written order denying the petitions for fitness examinations. In its order, the court found that there was no due process right to a fitness evaluation in a proceeding under the Act, nor was the right to a fitness evaluation implicitly contained in the Act itself.

¶ 34    Respondents filed a petition for leave to file a permissive interlocutory appeal pursuant to Rule 308, seeking certification of the following question: "Did the trial court err in denying the Respondents' request for a fitness evaluation?" The State filed a response arguing that the issue was not appropriate for interlocutory appeal and the proposed certified

---

[5]Hatter's petition for fitness examination was filed on June 20, 2010, after the trial court's disposition on the other respondents' petitions. In a *nunc pro tunc* order of consolidation dated September 28, 2010, the trial court ordered Hatter's case consolidated with that of the other respondents and ordered that the court's order of February 19, 2010, denying the petitions for fitness examinations applied to Hatter's petition for fitness examination.

question was overly broad. On July 29, 2010, the trial court granted the petition, finding that its order denying respondents' petitions for fitness examinations involved questions of law as to which there was substantial ground for a difference of opinion and an immediate appeal from that order could materially advance the ultimate termination of the litigation. The trial court certified three questions for interlocutory appeal:

"1. a. Does a trial court have the inherent authority to order a fitness evaluation of a respondent to a Sexually Violent Persons Commitment Act petition?

b. If such inherent authority exists, did the trial court abuse its discretion in denying the above-referenced respondents' requests for a fitness evaluation?

2. Does a respondent to a Sexually Violent Persons Commitment Act petition have a statutory right to a fitness evaluation?

3. Does a respondent to a Sexually Violent Persons Commitment Act petition have a constitutional due process right to a fitness evaluation?"

We granted leave to appeal on September 14, 2010.

¶ 35                                ANALYSIS

¶ 36     Illinois Supreme Court Rule 308 provides a remedy of permissive appeal from interlocutory orders where the trial court has deemed that they involve a question of law as to which there is substantial ground for difference of opinion and where an immediate appeal from the order may materially advance the ultimate termination of the litigation. We apply a *de novo* standard of review to legal questions presented in an interlocutory appeal brought pursuant to Rule 308. *Simmons v. Homatas*, 236 Ill. 2d 459, 466 (2010).

¶ 37                    I. Statutory Right to Fitness Evaluation

¶ 38     The first certified question we consider is whether a respondent to a petition for commitment under the Act has a statutory right to a fitness evaluation. "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent." *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 45 (2002). The best indication of legislative intent is the plain and ordinary meaning of the statutory language. *Birkett*, 202 Ill. 2d at 45. Since all provisions of a statutory enactment are viewed as a whole, words and phrases should not be construed in isolation, but should be interpreted in light of other relevant provisions of the statute. *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). "Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous." *Lieberman*, 201 Ill. 2d at 308 (citing *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001), and *A.P. Properties, Inc. v. Goshinsky*, 186 Ill. 2d 524, 532 (1999)). However, "[i]t is a cardinal rule of statutory construction that we cannot rewrite a statute, and depart from its plain language, by reading into it exceptions, limitations or conditions not expressed by the legislature." *People ex rel. Birkett v. Dockery*, 235 Ill. 2d 73, 81 (2009) (citing *In re Michelle J.*, 209 Ill. 2d 428, 437 (2004)).

¶ 39     Under the Act, a sexually violent person may be committed to the custody of the

-8-

Department of Human Services for control, care, and treatment until such time as the person is no longer a sexually violent person. 725 ILCS 207/40(a) (West 2004). A sexually violent person is "a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2004). The legislature did not provide a vehicle to determine if a sexually violent person can be restored to fitness. Section 25 of the Act concerns the rights of persons subject to petitions for commitment and provides, in relevant part:

> "(c) Except as provided in paragraph (b)(1) of Section 65 and Section 70 of this Act, at any hearing conducted under this Act, the person who is the subject of the petition has the right:
>
>> (1) To be present and to be represented by counsel. If the person is indigent, the court shall appoint counsel.
>>
>> (2) To remain silent.
>>
>> (3) To present and cross-examine witnesses.
>>
>> (4) To have the hearing recorded by a court reporter.
>
> (d) The person who is the subject of the petition, the person's attorney, the Attorney General or the State's Attorney may request that a trial under Section 35 of this Act be to a jury. A verdict of a jury under this Act is not valid unless it is unanimous.
>
> (e) Whenever the person who is the subject of the petition is required to submit to an examination under this Act, he or she may retain experts or professional persons to perform an examination. If the person retains a qualified expert or professional person of his or her own choice to conduct an examination, the examiner shall have reasonable access to the person for the purpose of the examination, as well as to the person's past and present treatment records and patient health care records. If the person is indigent, the court shall, upon the person's request, appoint a qualified and available expert or professional person to perform an examination. Upon the order of the circuit court, the county shall pay, as part of the costs of the action, the costs of a court-appointed expert or professional person to perform an examination and participate in the trial on behalf of an indigent person." 725 ILCS 207/25 (West 2004).

The parties agree that section 25 provides individuals subject to petitions for commitment "seven specific rights guaranteed to criminal defendants, namely the right to: (1) be present; (2) be represented by counsel; (3) remain silent; (4) present and cross-examine witnesses; (5) have the hearing recorded; (6) retain experts to aid in the defense; and (7) a trial by jury." Additionally, while not specifically listed, respondents argue that the right to a fitness evaluation is necessarily implied in section 25 because the enumerated rights cannot be exercised without being fit. We do not find this argument persuasive.

¶ 40    As noted, the plain language of section 25 specifically lists a number of rights available to individuals subject to petitions for commitment. A well-known rule of statutory construction provides that *expressio unius est exclusio alterius*, the expression of one thing in a statute excludes all others. See *In re D.W.*, 214 Ill. 2d 289, 308 (2005); *State v. Mikusch*, 138 Ill. 2d 242, 250 (1990). Applying the rule, the right to a fitness evaluation is not afforded to individuals subject to petitions under the Act because it is not among the specifically enumerated rights.

¶ 41    Moreover, this reading of the statute is consistent with the legislature's actions concerning a related provision of the Act. When the Act was initially enacted in 1998, section 35, concerning a trial to determine whether the subject of a petition was a sexually violent person, contained a provision providing:

> "(b) At the trial to determine whether the person who is the subject of a petition under Section 15 of this Act is a sexually violent person, all rules of evidence in criminal actions apply. All constitutional rights available to a defendant in a criminal proceeding are available to the person." 725 ILCS 207/35(b) (West 1998).

While additional language was later added to section 35(b), this language remained part of the Act through 2000. See 725 ILCS 207/35(b) (West 2000). However, in 2001, the legislature amended section 35(b) to remove the above-quoted language. See Pub. Act 92-415 (eff. Aug. 17, 2001).

¶ 42    Generally, a change to the unambiguous language of a statute creates a rebuttable presumption that the amendment was intended to change the law. *Mikusch*, 138 Ill. 2d at 252. Here, the amendment to section 35(b) removed the unambiguous language affording individuals on trial under the Act all of the rights given a criminal defendant, giving rise to a presumption that the legislature intended to change the law by removing those rights. This presumption is strengthened by the fact that this change was specifically noted during the Senate debate on the bill:

> "Now, up until this point, there have been some safeguards in place that say that all the rules that apply to a criminal trial and the–the rules of criminal evidence would apply to this commitment procedure because, although it's technically a civil procedure, the consequences are obviously very similar to incarceration. This eliminates that, in addition to the–the changes in the–in the juvenile records. I say that not because I think it's going to change any votes, but I think it's important to put on the record that, in fact, we are making it easier to commit these individuals and we're now also going to be able to access records, conceivably from twenty years previously, their juvenile records, to supplement or buttress our decision to commit these persons. So, I just wanted to get that read into the record." 92d Ill. Gen. Assem., Senate Proceedings, May 10, 2001, at 50 (statements of Senator Obama).

Thus, the legislature was presumably aware that the amendment to section 35(b) removed the language affording all individuals at trial under the Act with the protections afforded a criminal defendant. Respondents are correct when they note that the removed language was a blanket protection and did not specifically concern the right to a fitness evaluation.

However, the legislature's actions in narrowing the protections available to an individual subject to the Act is a persuasive indication that it did not intend to afford any protections beyond those specifically enumerated in the Act. Accordingly, since the right to a fitness evaluation is not listed among the specifically enumerated rights afforded individuals subject to petitions and in light of the legislature's amendment of a related provision of the Act to limit the rights afforded during trials, we find that the Act does not provide a statutory basis for a right to a fitness evaluation.

¶ 43                                II. Due Process

¶ 44    The next certified question we consider is whether a respondent to a petition under the Act has a constitutional due process right to a fitness evaluation. This question is one of first impression in Illinois. In order to analyze the issue, we apply the framework provided by the United States Supreme Court and examine the decisions from other jurisdictions that have considered the issue. Initially, we note that the Act is civil in nature, not criminal. See *In re Detention of Samuelson*, 189 Ill. 2d 548, 559 (2000). If the Act was criminal, respondents would have a right to a fitness evaluation, since a criminal defendant has a right to be competent. See *Medina v. California*, 505 U.S. 437, 453 (1992) (noting the United States Supreme Court's "long-standing recognition that the criminal trial of an incompetent defendant violates due process"). However, since the Act is not criminal, we must determine whether a respondent under the Act has a due process right to be competent and, by extension, has a right to a fitness evaluation.

¶ 45                             A. *Mathews* Factors

¶ 46    " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). It " 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Mathews*, 424 U.S. at 334 (quoting *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961)). In order to determine whether procedures are constitutionally sufficient, courts balance three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335; see also *People v. Botruff*, 212 Ill. 2d 166, 179 (2004) (applying *Mathews* factors in the context of the Act). These factors determine what procedures are required under both the fourteenth amendment due process clause and the due process clause of the Illinois Constitution. *Botruff*, 212 Ill. 2d at 179.

¶ 47    The first *Mathews* factor we consider is the private interest that will be affected by the official action. See *Mathews*, 424 U.S. at 335; *Botruff*, 212 Ill. 2d at 179. Here, the private interest at stake is a respondent's liberty interest. *Botruff*, 212 Ill. 2d at 179 ("the private

interest at stake here is respondent's liberty interest"); see also *Moore v. Superior Court*, 237 P.3d 530, 541, 543 (Cal. 2010); *Commonwealth v. Nieves*, 846 N.E.2d 379, 385 (Mass. 2006). If a respondent is found to be a sexually violent person, he or she may be committed for institutional care in a "secure facility" for an indefinite time. 725 ILCS 207/40(a) (West 2004) (the respondent is "committed to the custody of the Department [of Human Services (DHS)] for control, care and treatment until such time as the person is no longer a sexually violent person"); 725 ILCS 207/40(b)(2) (West 2004) (the order for commitment "shall specify either institutional care in a secure facility, *** or conditional release").

¶ 48    The State argues that the private interest at stake is not a respondent's liberty interest but rather "the incremental interest in commitment to a DHS facility other than the Treatment and Detention Facility." Under the State's theory, the options available to a respondent raising a fitness issue are (1) being confined at a treatment and detention facility under the Act as a sexually violent person or (2) being confined through an unfitness proceeding, either under the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-100 *et seq.* (West 2004)) or in a secure DHS facility under a procedure analogous to that applicable to unfit criminal defendants. However, the State assumes that the respondent would be determined to be a sexually violent person and so misses a third option: the respondent ultimately prevails during the commitment proceeding. Thus, the interest here is not necessarily determining which facility to house a respondent in but rather determining whether the respondent is committed at all. We agree with respondents that their liberty interest is the interest at stake and weighs in favor of finding a right to a fitness evaluation.

¶ 49    The second *Mathews* factor requires us to consider the risk of an erroneous deprivation of the private interest through the procedures used and the probable value of any additional procedural safeguards. See *Mathews*, 424 U.S. at 335; *Botruff*, 212 Ill. 2d at 179. Here, the procedural safeguards of the Act ensure that the risk of erroneous deprivation of liberty is slight. The Act requires a petition for commitment to be filed no more than 90 days prior to the time of discharge or entry into mandatory supervised release. 725 ILCS 207/15(b-5) (West 2004). Upon the filing of a petition, the trial court must review the petition to determine whether there is cause to believe that the person is eligible for commitment and must then conduct a probable cause hearing, generally within 72 hours of the time the petition is filed. 725 ILCS 207/30(a), (b) (West 2004). As noted previously, at a hearing under the Act, the respondent has the right (1) to be present, (2) to be represented by counsel or to have counsel appointed to him, (3) to remain silent, (4) to present and cross-examine witnesses, (5) to have the hearing recorded by a court reporter, (6) to have a jury trial, and (7) to retain experts. 725 ILCS 207/25(c) through (e) (West 2004). If probable cause is found to exist, the respondent is transferred to an appropriate facility for an evaluation to determine whether the respondent is a sexually violent person. 725 ILCS 207/30(c) (West 2004).

¶ 50    A trial to determine whether the respondent is a sexually violent person is held no more than 120 days from the date of the probable cause hearing. 725 ILCS 207/35(a) (West 2004). The State has the burden of proving the allegations in the petition beyond a reasonable doubt, and mere evidence that the respondent committed a sexually violent offense prior to the sexually violent offense that is the basis for the petition is not sufficient to establish beyond

-12-

a reasonable doubt that the respondent has a mental disorder. 725 ILCS 207/35(d)(1), (e) (West 2004). If the respondent is committed, DHS is required to submit a written report within 6 months after the initial commitment and then at least once every 12 months thereafter for the purpose of determining whether the respondent has made sufficient progress to be conditionally released or discharged; the court that ordered the commitment also has the power to order an examination of the respondent at any time while the respondent is subject to the commitment order. 725 ILCS 207/55(a), (c) (West 2004). The respondent may petition for conditional release every six months, which triggers a reexamination of the respondent's mental condition and a new probable cause hearing. 725 ILCS 207/60(a), (c) (West 2004). Additionally, the respondent may petition the court for discharge. 725 ILCS 207/65 (West 2004). These procedures ensure that the risk of an erroneous deprivation of liberty is slight. See *Botruff*, 212 Ill. 2d at 179-80 (finding risk of erroneous deprivation was slight in considering whether due process required a respondent to have the right to be present at the probable cause hearing at the time of a periodic reexamination under the Act).

¶ 51 In their petition for rehearing, respondents point to the fact that Hatter was not "screened out" despite Dr. Tsofilias' recommendation that Hatter remain in a DHS Department of Mental Health facility because he lacked the capacity to participate in sex offender treatment. They cite Hatter's case as an example of the procedures' inadequacy. However, it is the system of procedures as a whole that provide protection against an erroneous deprivation of liberty, and the fact that Hatter was not immediately "screened out" does not necessarily mean that the entire system is inadequate. They also argue that postcommitment procedures are inadequate because progress in sex offender treatment is a "key component" of the determination of whether a respondent remains confined under the Act. However, in making that determination, the circuit court must consider a number of factors, including "the nature and circumstances of the behavior that was the basis of the allegation in the petition [for commitment under the Act], the person's mental history and present mental condition, where the person will live, how the person will support himself or herself and what arrangements are available to ensure that the person has access to and will participate in necessary treatment." 725 ILCS 207/60(d) (West 2004). Thus, participation in treatment is not the sole factor in the determination. Moreover, once the respondent has shown "that cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release," the respondent is entitled to a hearing at which it is the State's burden to prove by clear and convincing evidence that the respondent has *not* made sufficient progress to be conditionally released. 725 ILCS 207/60(c), (d) (West 2004). Accordingly, we find respondents' arguments concerning the inadequacy of the statutory procedures to be unpersuasive.

¶ 52 Additionally, finding a right to a fitness evaluation would likely add minimal value to the proceedings. At any hearing pursuant to the Act, the respondent is represented by counsel, who will have had the opportunity to examine the reports of the psychologists performing the mental examinations. These reports, as well as the respondent's prior offenses, will generally form the basis of the probable cause finding or the finding that the respondent is

-13-

a sexually violent person. In the case of any prior offenses, the underlying facts have already been established by the conviction, adjudication, or finding of not guilty by reason of insanity, so they will no longer be at issue. See 720 ILCS 5/6-2(e) (West 2004) (A jury "may not consider whether the defendant has met his burden of proving that he is not guilty by reason of insanity until and unless it has first determined that the State has proven the defendant guilty beyond a reasonable doubt of the offense with which he is charged."). Finally, we agree with the Supreme Court of California, which rejected a similar argument:

> "[T]he nature of the issues, evidence, and findings in [a sexually violent predator] proceeding prevents *any* defendant from playing much more than a supporting role. His account of his own history and conduct may supplement the foundation on which experts rely in forming their opinions. But it is the combined substance of such opinion evidence, including all the other information on which it is based, that resolves the critical question whether, as of the date of the trial, defendant had a mental disorder that made it likely he would engage in sexually violent criminal behavior. [Citation.] Thus, any chance that [a sexually violent predator's] mental incompetence would significantly impair his contribution to his defense seems relatively attenuated." (Internal quotation marks omitted.) (Emphasis in original.) *Moore*, 237 P.3d at 543.

¶ 53    Respondents argue that competency is a rudimentary right and that procedural protections only have value when the recipient of those rights is fit to exercise them. However, respondents' argument focuses on the competency of a defendant in a criminal case. As noted, commitment proceedings under the Act are civil, not criminal, and respondents point to no requirement for a fitness evaluation in the civil context. In their petition for rehearing, respondents state that there is no reason "how, or why, a rudimentary right becomes any less elemental simply because an individual faces loss of liberty in the context of a civil proceeding, rather than a criminal matter." However, it is well established that not all rights afforded a criminal defendant apply to a party in a civil proceeding. See, *e.g.*, *Botruff*, 212 Ill. 2d at 181-82 (holding that respondents under the Act had no right to be present at probable cause hearings at the time of periodic reexamination). To determine whether procedural due process requires the recognition of a right to a fitness evaluation applies in the case of proceedings under the Act, we apply the *Mathews* factors. In considering the second *Mathews* factor, we find that the risk of erroneous deprivation of liberty is slight and that recognizing a right to a fitness evaluation would not have more than minimal value. However, it is possible that allowing for fitness evaluations could have the effect of lowering the risk of erroneous deprivation of liberty even further, so while this factor weighs in favor of the State's position, it is not overwhelmingly so.

¶ 54    The final *Mathews* factor requires us to consider the government's interest, including the additional administrative burden of the additional procedural safeguard. See *Mathews*, 424 U.S. at 335; *Botruff*, 212 Ill. 2d at 179. Here, the State has an interest in protecting its citizens from violent sexual offenders and also has an interest in treating the mental disorders of those offenders. Respondents acknowledge these important governmental interests, but argue that allowing a fitness evaluation would not impact that interest because incompetent

respondents could remain civilly committed while competency was restored. They also claim that courts evaluating petitions under the Act can "seamlessly" apply the statutory framework present in the criminal context. We disagree. We are reluctant to require courts considering petitions under the Act to apply a statutory framework that was developed in order to be used in a different context concerning different individuals. We find instructive the *Moore* court's analysis on the same issue when presented with the argument that the criminal code's framework could be used. The court noted that the nature of a placement under the criminal framework depended in part on the nature of the charges the defendant faced and it was uncertain how to apply such a distinction in a case where the alleged sexually violent predator had already been convicted of one or more sexually violent crimes. *Moore*, 237 P.3d at 546. The court also reasoned:

> "The[ ] strict standards and protocols [of the sexually violent predators act], whose purpose is to keep the community safe from the sexually predatory propensities of persons who qualify as [sexually violent predators], also help protect patients and workers inside the state mental hospital system. The danger to these groups would be enhanced if persons allegedly too incompetent to be tried and committed as [sexually violent predators] were to be housed indefinitely, and perhaps permanently, in places not designed and staffed to deal with the peculiar risks they pose. Thus, as the People suggest, we would have no relevant template if we allowed [sexually violent predator] defendants to avoid trial while incompetent." *Moore*, 237 P.3d at 546.

We face a similar problem here. We are not persuaded by respondents' use of themselves as examples of individuals who have not "posed an unmanageable threat to residents or staff" at DHS facilities or have been previously restored to fitness within one year. If we were to impose a rule requiring fitness evaluations, this rule would apply to any respondents subject to petitions under the Act who present a *bona fide* doubt as to their fitness, not merely to the five respondents here. We find that the State's interest in public safety and providing treatment to sexually violent persons provides sufficient justification to deny a right to a fitness evaluation, especially given that there is no statutory template for courts to apply. As the *Nieves* court noted, "[w]e see no reason why the public interest in committing sexually dangerous persons to the care of the treatment center must be thwarted by the fact that one who is sexually dangerous also happens to be incompetent." *Nieves*, 846 N.E.2d at 385.

¶ 55                                    B. Other Jurisdictions

¶ 56        While this issue is one of first impression in Illinois, several other states have considered the issue under similar commitment schemes. Of the eight states to consider the issue, seven have found no right to a fitness evaluation, while the eighth has found such a right in limited circumstances. Additionally, an Illinois court has found that fitness evaluations are not required under the Sexually Dangerous Persons Act (725 ILCS 205/0.01 *et seq.* (West 2004)).

¶ 57        In *People v. Akers*, 301 Ill. App. 3d 745 (1998), the Fourth District Appellate Court

considered whether a respondent subject to commitment under the Sexually Dangerous Persons Act was entitled to a fitness evaluation. The court noted that a defendant has a constitutional right not to be subject to a criminal proceeding if he is unfit to stand trial and thus proceeded to consider whether a proceeding under the Sexually Dangerous Persons Act was a criminal proceeding. *Akers*, 301 Ill. App. 3d at 749. The court noted that the Sexually Dangerous Persons Act provided that the proceedings were civil in nature, but also provided several protections found in criminal cases, such as proving the allegations beyond a reasonable doubt, the right to a jury trial, and the right to be represented by counsel. *Akers*, 301 Ill. App. 3d at 749-50. The court also considered the Illinois Supreme Court's decision in *People v. Allen*, 107 Ill. 2d 91 (1985), in which the Illinois Supreme Court held that a Sexually Dangerous Persons Act proceeding was not a criminal prosecution and therefore a defendant's privilege against self-incrimination did not apply. *Akers*, 301 Ill. App. 3d at 750. The *Akers* court noted that the *Allen* court explained its decision by pointing out that the Sexually Dangerous Persons Act included a number of procedural safeguards ensuring reliability and that the privilege against self-incrimination would add little more reliability to the proceedings and would impede the State's substantial interest in treating as well as protecting the public from sexually dangerous individuals. *Akers*, 301 Ill. App. 3d at 750. Finally, the *Akers* court emphasized that the *Allen* court wrote that " 'one purpose of the statute is to prevent mentally ill persons from being held criminally responsible for crimes committed while mentally ill.' " *Akers*, 301 Ill. App. 3d at 751 (quoting *Allen*, 107 Ill. 2d at 105). The *Akers* court noted that the Illinois Supreme Court's decision was affirmed by the United States Supreme Court and that, applying the teachings from both courts, the concerns about a defendant's fitness to stand trial were not applicable in the context of a proceeding under the Sexually Dangerous Persons Act. *Akers*, 301 Ill. App. 3d at 751. The court also noted that holding otherwise could lead to absurdity:

> "If defendant were correct that he had a right to have a fitness hearing when a *bona fide* doubt of his fitness to stand trial arose during his [Sexually Dangerous Persons Act] proceedings, then the result might be the following: (1) an unfit defendant would be committed to the custody of one state agency for treatment of his mental condition until such time as he became fit to stand trial, at which point he could stand trial on the State's petition that he is [a sexually violent person]; and (2) if the State proves its charge, he would then be committed to a different state agency, *again* for the purpose of receiving care and treatment to address his mental condition.
>
> We conclude that the legislature could not have intended this absurd situation when it enacted the [Sexually Dangerous Persons] Act and article 104 of the Code [governing criminal fitness proceedings]." (Emphasis in original.) *Akers*, 301 Ill. App. 3d at 752.

Accordingly, the court found no right to a fitness evaluation.

¶ 58    Several of the other states considering similar statutes as the Act have shared the *Akers* court's focus on whether the proceeding is criminal or civil. The first court to consider the issue was the Court of Appeals of Missouri, in *State ex rel. Nixon v. Kinder*, 129 S.W.3d 5 (Mo. Ct. App. 2003). In *Kinder*, the court considered whether an individual was entitled to

a competency examination prior to proceedings seeking to commit him as a sexually violent predator. The court noted that since the civil statutes did not provide for a right of competency, the basis for such a right needed to be located either in court rules or in the requirements of due process. *Kinder*, 129 S.W.3d at 8. The court first found that court rules did not provide for such a right, commenting that "[t]he very nature of civil commitments is that they commit for treatment those who pose a danger to themselves or others because they suffer from a mental disease or defect and are unable to comprehend reality or to respond to it rationally." *Kinder*, 129 S.W.3d at 8.

¶ 59 The court then determined that due process did not require the right to be competent, stating that "[r]elevant case authority, the conferral of a number of rights normally enjoyed in the criminal setting allowed for in the special statutory proceedings of the sexually violent predator act, and the option of invoking Rule 52.02 [providing for the appointment of a guardian *ad litem* for mentally or physically impaired persons] demonstrate sufficient due process protection in a sexually violent predator determination trial." *Kinder*, 129 S.W.3d at 9. The court noted that while case law provided that the due process clause included a right to not be tried while unfit in the criminal context, no such precedent applied in determining whether such a right existed in the context of a civil commitment trial under the Missouri statute. *Kinder*, 129 S.W.3d at 9. The court further reasoned that the goal of the legislature in determining the need for and providing treatment demonstrated that the statute was not punitive, especially given that a mental examination was required once probable cause was established but the statute did not mention a person's competency as a prerequisite for commitment. *Kinder*, 129 S.W.3d at 9. Thus, the court concluded that "[c]ivil commitment for sexually violent predator treatment shares no parallel with the determination of lack of competency *** in criminal trials." *Kinder*, 129 S.W.3d at 9-10. The court also pointed to the fact that precedent exists for civilly committing a person who is not competent to stand trial in a criminal proceeding once it is evident that the person will not retain competency in the foreseeable future. *Kinder*, 129 S.W.3d at 10. Finally, the court noted the numerous procedural protections available to an individual subject to commitment, including the right to a probable cause hearing, the right to appear in person and to be represented by counsel, and the reasonable doubt standard of proof; the court noted that "[s]ignificantly, the right to be competent for trial at a sexually violent predator proceeding is not included in the sexually violent predator statutes." *Kinder*, 129 S.W.3d at 11.

¶ 60 Similarly, the Supreme Court of Iowa held that there was no due process right to be competent during the course of proceedings to determine if an individual was a sexually violent predator. *In re Detention of Cubbage*, 671 N.W.2d 442 (Iowa 2003). The court analyzed the issue as a substantive due process issue and considered whether the respondent had a fundamental right to be competent. *Cubbage*, 671 N.W.2d at 446. The court noted that a commitment proceeding was civil in nature and that "the same concerns and concomitant protections that arise in a criminal case do not necessarily arise in the [sexually violent predator act] area. [Citations.] We believe this principle is key to the determination of whether Cubbage holds a fundamental right to be competent during the [sexually violent predator act] proceedings." *Cubbage*, 671 N.W.2d at 447. The court noted that a fundamental

-17-

right to be competent in the civil commitment context had not been previously recognized and held that a respondent to a commitment proceeding under the statute did not have a fundamental right to be fit and, accordingly, conducted a rational basis review of the statute, which the statute satisfied. *Cubbage*, 671 N.W.2d at 448.

¶ 61 The Supreme Court of Texas reached the same conclusion in *In re Commitment of Fisher*, 164 S.W.3d 637 (Tex. 2005). In that case, the Texas court held that an individual who was incompetent to stand trial in a criminal matter could nonetheless be civilly committed as a sexually violent predator. *Fisher*, 164 S.W.3d at 653. The court noted that the legislature contemplated that not all alleged sexually violent predators would be mentally competent, pointing to the statute's definition of a sexually violent offender as including someone found not guilty by reason of insanity. *Fisher*, 164 S.W.3d at 653. The court further noted that involuntary commitment did not trigger the same constitutional protections as a criminal case and found no right to a competency determination. *Fisher*, 164 S.W.3d at 654.

¶ 62 In *In re Commitment of Luttrell*, 2008 WI App 93, 754 N.W.2d 249, the Court of Appeals of Wisconsin considered whether a respondent was entitled to a competency evaluation. The Wisconsin court held that there was no criminal law-based due process right to a competency hearing in a proceeding under the Wisconsin version of the Act because someone determined to be a sexually violent person is confined for treatment and not for punishment. *Luttrell*, 2008 WI App 93, ¶ 9, 754 N.W.2d 249. The court noted that a contention otherwise "ignores the special indicium of a civil commitment, which, per force, cannot depend on whether that person is competent." *Luttrell*, 2008 WI App 93, ¶ 10, 754 N.W.2d 249. The court pointed out that significant mental impairment was a condition to commitment under the statute and that, due to an amendment to the statute, respondents were no longer afforded all of the same rights as criminal defendants:

> "Persons who are proper subjects for a WIS. STAT. ch. 980 commitment suffer mental illness that makes them prone to further predatory sexual violence. [Citation.] Now that WIS. STAT. § 980.05(1m) (2003-04) has been repealed, the law no longer lets those who are *so* mentally ill that they are not 'competent' under WIS. STAT. § 971.13 fall through the cracks to continue their predatory sexual violence. The cracks are there because an involuntary civil commitment under WIS. STAT. ch. 51 requires a *recent* violent act, attempt, or threat. Thus, a ch. 51 commitment for the subject of a ch. 980 petition is impossible unless that person, who, of course, is locked up when the ch. 980 petition is filed, committed a recent act, attempt, or threat of violence." (Emphasis in original.) *Luttrell*, 2008 WI App 93, ¶ 11, 754 N.W.2d 249.

Thus, the court found no right to a fitness evaluation.

¶ 63 The only court to have found a right to a competency evaluation was the Court of Appeal of Florida in *In re Commitment of Branch*, 890 So. 2d 322 (Fla. Dist. Ct. App. 2004). In *Branch*, the Florida court held that "under certain circumstances a respondent who is not competent is denied the opportunity to be heard in a meaningful manner." *Branch*, 890 So. 2d at 326. Under the facts of that case, the psychologist who opined that the respondent had

-18-

a mental abnormality qualifying him for commitment as a sexually violent predator testified at the commitment proceeding that the most important factor in reaching his conclusion was the respondent's pattern of deviant sexual behavior. *Branch*, 890 So. 2d at 324. The psychologist determined that the respondent exhibited the pattern based exclusively on documents indicating that the respondent had sexually assaulted several people; the respondent had never been prosecuted for the crimes, and the psychologist did not investigate the offenses further but testified that he "was simply taking the reports of that behavior at face value." *Branch*, 890 So. 2d at 324.

¶ 64        On appeal, the Florida court found that the respondent had a right to a competency evaluation under the limited circumstances of that case. *Branch*, 890 So. 2d at 329. The court pointed to several Florida cases, finding that they stood for the proposition that the respondent had a due process right to challenge the factual assertions contained in documents underlying expert opinions "when those factual assertions have neither been admitted through a plea nor tested at trial" and concluded that the respondent must be competent to meaningfully exercise that right. *Branch*, 890 So. 2d at 327. The court distinguished *Cubbage* and *Kinder* by noting that in neither of those cases was the State attempting to commit the respondents based solely on hearsay, but was using prior convictions for sexual offenses. *Branch*, 890 So. 2d at 328. The court cautioned that not every respondent had a right to be competent at a commitment proceeding:

> "Instead, Ryce Act respondents have a due process right to be competent only when the State intends to present hearsay evidence of alleged facts that have neither been admitted by way of a plea not subjected to adversarial testing at trial and so are subject to dispute and counterevidence. Thus, it is the State's trial strategy that will determine whether a Ryce Act respondent must be competent. If the State chooses to proceed against a Ryce Act respondent based on hearsay reports of prior bad acts that did not result in prosecution or conviction to establish an element of its case, the State may do so only when the respondent is competent to challenge that evidence." *Branch*, 890 So. 2d at 329.

¶ 65        Respondents argue that the above cases from foreign jurisdictions did not apply the *Mathews* factors and so "carry no persuasive weight." We disagree. We find it persuasive that every state to consider the issue has found that there is no due process right to be competent at a commitment proceeding under that state's version of the Act, with the limited exception of certain factual scenarios in Florida. We also find the Florida case of *Branch* to be distinguishable from the facts of the case at bar, since there is no indication that the opinions of the psychologists examining respondents here were relying solely on hearsay reports of prior bad acts. Under the factual situation here, the reasoning of *Branch* indicates that the Florida court would also find no right to fitness, as in the other cases we have discussed. See *Branch*, 890 So. 2d at 328 ("respondents in Ryce Act proceedings have no due process right to be competent when the State's evidence supporting commitment is entirely of record"). Additionally, we find it especially persuasive that Wisconsin has found that there is no due process right, as our supreme court has stated that the Wisconsin statute is similar to the Act and has applied the Wisconsin Supreme Court's reasoning in interpreting the

statute. See *In re Detention of Hardin*, 238 Ill. 2d 33, 54 (2010) (adopting Wisconsin Supreme Court's evidentiary standard for probable cause proceedings under the Act); *Botruff*, 212 Ill. 2d at 181. However, even if we discounted this authority, there are three cases from other jurisdictions that apply the *Mathews* factors in reaching the conclusion that there is no due process right to a fitness hearing. We have already discussed them somewhat in our analysis of the *Mathews* factors, but provide a brief overview here.

¶ 66    In *Nieves*, the Supreme Judicial Court of Massachusetts found that there was no due process violation when an incompetent person stood trial in a commitment proceeding. *Nieves*, 846 N.E.2d at 385. The Massachusetts court applied the *Mathews* factors in reaching its conclusion. The court first found that the respondent's private interest was "weighty," noting that if committed, his loss of liberty would be "total." *Nieves*, 846 N.E.2d at 385. However, the court further found that "the defendant's interest must, with appropriate safeguards, yield to the Commonwealth's paramount interest in protecting its citizens," and reasoned that "[w]e see no reason why the public interest in committing sexually dangerous persons to the care of the treatment center must be thwarted by the fact that one who is sexually dangerous also happens to be incompetent." *Nieves*, 846 N.E.2d at 385. Finally, the court found that "[t]he robust, adversary character" of the commitment proceedings minimized the risk of the erroneous commitment of a person who was not sexually dangerous, noting that the respondent had the right to counsel. *Nieves*, 846 N.E.2d at 385. The court also stated that under Massachusetts law, the respondent's attorney would generally be able to exercise the respondent's rights if the respondent was incompetent to do so. *Nieves*, 846 N.E.2d at 386.

¶ 67    The second case applying the *Mathews* factors is the Supreme Court of California's recent decision in *Moore*. In *Moore*, the California court applied its version of the due process analysis, consisting of the three *Mathews* factors plus a fourth factor considering "the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official." *Moore*, 237 P.3d at 539. The court found that the respondent in a sexually violent predator proceeding had significant liberty and dignitary interests. *Moore*, 237 P.3d at 543. However, the court found that the risk of erroneous confinement was small, noting that "any chance that [a sexually violent predator's] mental incompetence would significantly impair his contribution to his defense seems relatively attenuated," and pointing to the "numerous procedural safeguards" available to such a respondent, including "heightened statutory requirements, like jury unanimity and the reasonable doubt standard of proof, [that] help mitigate the risk that an incompetent person would be erroneously adjudicated as [a sexually violent person] in the first place." *Moore*, 237 P.3d at 543. It concluded that "the strong governmental interest in protecting the public through the proper confinement and treatment of [sexually violent predators] *** would be substantially impeded by recognizing [a sexually violent predator's] right to delay or avoid targeted confinement and treatment for a sexually violent mental disorder because his mental problems make him incompetent to stand trial." *Moore*, 237 P.3d at 540.

¶ 68    Finally, the Court of Appeals of Washington recently considered competency in the

context of sexually violent predator commitment proceedings in *In re Detention of Morgan*, 253 P.3d 394 (Wash. Ct. App. 2011). In *Morgan*, the Washington court applied the *Mathews* factors to determine whether a respondent in a sexually violent predator proceeding has a procedural due process right to be competent during the commitment proceeding. *Morgan*, 253 P.3d at 400. The court found that the first *Mathews* factor weighed in the respondent's favor, since civil commitment deprived him of significant liberty interests. *Morgan*, 253 P.3d at 401. However, the court found that the other two factors weighed in the State's favor. *Morgan*, 253 P.3d at 401. The court found that there were no additional safeguards that could have been put in place to minimize a risk of an erroneous deprivation of the respondent's rights, since the respondent attended the civil commitment trial "and had counsel vehemently defending his rights." *Morgan*, 253 P.3d at 401. The court also adopted the reasoning of an earlier case, in which it had rejected a right to fitness in a proceeding to determine the respondent's culpability for the predicate sexually violent offense. *Morgan*, 253 P.3d at 401. Finally, the court found that the governmental interest "weigh[ed] heavily" in favor of the State, noting that "[t]he State has a strong interest in detaining 'mentally unstable individuals who present a danger to the public' " (*Morgan*, 253 P.3d at 402 (quoting *United States v. Salerno*, 481 U.S. 739, 748-49 (1987)), and that " 'it is irrefutable that the State has a compelling interest both in treating sex predators and protecting society from their actions' " (*Morgan*, 253 P.3d at 402 (quoting *In re Personal Restraint Petition of Young*, 857 P.2d 989, 1000 (Wash. 1993) (en banc))).

¶ 69   The court agreed with the reasoning of the Supreme Court of California in *Moore*, noting:

   "The *Moore* court's reasoning highlights the tension between Morgan's claim to competency and the [sexually violent predator] civil commitment requirements. Namely, [sexually violent predator] civil commitment requires the existence of a mental illness, but is there a point where an individual becomes *too* mentally ill that he is incompetent and cannot be civilly committed? Indeed, there are likely some situations in which a person who is convicted of a sexually violent offense, and then becomes incompetent, might never regain competency for a civil commitment proceeding. We resolve this tension in a similar manner as the *Moore* court, discerning no due process violations when a respondent is not competent during [sexually violent predator] proceedings." (Emphasis in original.) *Morgan*, 253 P.3d at 402.

The court also distinguished *Branch*'s contrary holding, finding that unlike the situation in the Florida case, proof of the predicate offense in *Morgan* was not at issue, since it was proven through a judgment and sentence based on the respondent's guilty plea. *Morgan*, 253 P.3d at 403. The court noted that in the case before it, the issue was the respondent's current mental state, which the jury was able to evaluate to determine whether he should be committed. *Morgan*, 253 P.3d at 403.

¶ 70   Based on our analysis of the *Mathews* factors, which is supported by the Illinois case of *Akers* and case law from other jurisdictions considering analogous statutes, we find that there is no due process right to a fitness evaluation in the case of a proceeding under the Act.

¶ 71                                          III. Inherent Authority

¶ 72        The final certified question we address is whether the trial court has the inherent authority to order a fitness evaluation of a respondent under the Act and if so, whether the court here abused its discretion in denying respondents' requests for fitness evaluations. Courts have inherent authority to guarantee each defendant a fair trial. *People v. Walker*, 232 Ill. 2d 113, 129 (2009) (citing *People v. Lawson*, 67 Ill. 2d 449, 456 (1977)). " 'These powers enable the circuit court simultaneously to protect the legitimate rights of defendants, maintain respect for its calendar, and satisfy the public's interest in the fair and efficient prosecution of those accused of crime.' " *Walker*, 232 Ill. 2d at 129 (quoting *People v. Rudi*, 103 Ill. 2d 216, 222 (1984)). Respondents argue that ordering a fitness evaluation is the type of decision that a trial court can make in the exercise of its inherent authority.

¶ 73        When examining cases in which a court has exercised its inherent authority, it is apparent that courts have exercised their authority in areas such as preventing witnesses from discussing testimony (see *Smith v. City of Chicago*, 299 Ill. App. 3d 1048, 1055 (1998)), finding parties in contempt of court (see *Circle Management, LLC v. Olivier*, 378 Ill. App. 3d 601, 612 (2007)), and staying proceedings (see *Estate of Bass v. Katten*, 375 Ill. App. 3d 62, 68 (2007)). However, these actions are different from the type of order respondents seek here. While respondents are correct that there is no caselaw concerning a trial court's inherent authority to order fitness evaluations in cases arising under the Act, we do not think that this type of order is analogous to those cited above. Instead, this case is closer to a situation such as in *J.H. v. Ada S. McKinley Community Services, Inc.*, 369 Ill. App. 3d 803, 812 (2006), in which the appellate court found that the trial court did not have inherent authority to *sua sponte* appoint a guardian *ad litem* for competent plaintiffs who were represented by counsel that objected to the appointment on their behalf. Here, as the answers to the previous certified questions demonstrated, respondents do not have a right to a fitness evaluation. Since they do not have a right to a fitness evaluation, any decision concerning a fitness evaluation would not implicate respondents' ability to receive a fair commitment trial. Accordingly, we find that the trial court did not have the inherent authority to order fitness evaluations of respondents.

¶ 74                                               CONCLUSION

¶ 75        We answer all three of the certified questions in the negative. Respondents do not have a right to a fitness evaluation under the statutory language of the Act and do not have a due process right to a fitness evaluation. Since they have no right to a fitness evaluation, the trial court did not have the inherent authority to order them.

¶ 76        Certified questions answered.